OGDEN and others, Respondents, vs. STRAUS BUILDING COR-
PORATION and others, Appellants.

*November 17, 1924—June 22, 1925.*

*Easements: Common alley: Appurtenance to land: Party-wall agree-
ment: How construed: Parol evidence: Intention of parties:
Mutual quitclaims of adjoining owners: Release of rights in
alley: Reservation or exception: Construction: Underground
encroachment on alley: Inconsequential projections over sur-
face: Nature of relief granted.*

1. Where plaintiffs, owning the east fifty feet of two contiguous
   lots, being a parcel of land one hundred feet in depth, made a
   party-wall agreement with the owners of part of such lots on
   the west by which a wall one hundred feet long was to be
   built, the cost of the south ninety feet to be borne equally by
   the parties and the cost of the north ten feet, extending
   across an east-and-west alley appurtenant to the lots, to be borne
   by plaintiffs, that part of the agreement conveying and war-
   ranting the west twelve inches of plaintiffs' property is con-
   strued, in view of all the circumstances and express reserva-
   tions in prior deeds of the alley and of its common use by
   occupants of various portions of the lots, not to cut off plaint-
   iffs from access to the alley.  p. 248.
2. The intention of parties in the execution of a party-wall agree-
   ment must be gathered from the agreement as a whole and·
   every constituent part thereof, taking into consideration the
   relations of the parties to each other and to the whole.  p. 242.
3. Where, in such an agreement, there was ambiguity as to the
   reason why the cost of construction of part thereof was not
   to be borne by both parties, parol evidence was admissible to
   apply the agreement to the subject matter.  p. 245.
4. The cardinal principle in the construction of contracts is to
   ascertain the intention of the parties.  p. 245.
5. The common-law rule that permits evidence to be introduced in
   order to apply a contract to the subject with which it deals,
   and which permits evidence showing how the parties them-·
   selves treated the contract, is as fundamental as is the rule
   that oral testimony cannot be introduced to vary the terms
   of an unambiguous written contract.  p. 252.
6. The right of lotowners to use a common·alley is an appurte-
   nance to the land.  p. 254.
7. Where adjoining owners, after erecting a party-wall pursuant
   to the agreement, made a supplemental agreement for the
   purpose of more definitely fixing their common boundary, that
   clause in the latter agreement by which each quitclaimed to

the other any interest he might have on the other side of the dividing line is, under all the circumstances, construed not to constitute a release of their respective rights to an easement in the private alley.   p. 255.

8. Whether the conveyance creates a reservation or an exception depends largely on the language used with reference to the subject matter in the light of the particular circumstances; a "reservation" being something to be deducted, narrowing or limiting what would otherwise pass, while an "exception" operates to withdraw part of the thing granted.   p. 259.

9. Conveyances made subject to a reserved right to all owners to a common alley are expressive of a reservation and not of an exception.   p. 259.

10. Where the original grantor, in conveyances of various portions of certain lots, made them "subject to the reserved right of the respective owners of different portions of said lots . . . to a common alley or passageway to and from . . . which said passageway with width aforesaid . . . is to be kept open for a passageway . . . for the common benefit of" such owners, it is *held* that, in view of the subsequent acts and conduct of the parties and of present conditions which might reasonably have been anticipated at the time the alley or passageway was reserved, it was necessary that it be kept open and unobstructed for its full width from the surface to the sky.   p. 260.

11. In case of a reservation in a deed, the language used should be construed most favorably to the original grantor.   p. 261.

12. Where adjoining owners had the fee title to the respective portions of their premises included in a common alley subject to an easement of passage, an underground encroachment by one owner upon part of the alley belonging to the other is not a basis for ejectment by the latter, he being in entire possession of such part.   p. 266.

13. In case of such an encroachment on an alley reserved for the common use of the lots, the party aggrieved thereby is entitled to equitable relief, and not relief by way of ejectment.   p. 266.

14. A light-and-air agreement between adjoining owners is *held* not to constitute claim or color of title such as to set in motion the ten-year statute of limitations in favor of a claim of adverse possession by one owner of a common alley.   p. 268.

15. Where the removal of an encroachment of a building foundation underneath a common alley would entail great loss, and the projections above the surface were not of a substantial nature and did not materially interfere with the rights to light and air, the removal thereof would be inequitable.   p. 269.

16. Equity, in an effort to do substantial justice between parties, will not endeavor to commit a wrong, even to a wrongdoer. p. 269.

APPEALS from a judgment of the circuit court for Milwaukee county: GUSTAVE G. GEHRZ, Circuit Judge. *Modified and affirmed.*

Separate appeals by the defendants *Straus Building Corporation, Stella D. Thompson, Henry M. Thompson,* and the *Hotel Wisconsin Realty Company* from a judgment in an action brought by the plaintiffs to enjoin the defendant *Straus Building Corporation* from building on or over a certain private alley hereinafter more particularly described and referred to.

Various counterclaims and cross-complaints were interposed by the defendants *Thompson, Straus Building Corporation,* and the *Hotel Wisconsin Realty Company,* which, together with the relief prayed for, will be more particularly set forth and referred to in the opinion.

Grand avenue is a public street in the city of Milwaukee, running east and west, and is intersected by Third street, which runs due north and south. Said intersection is in the very heart of the retail business portion of said city, and the property located in close proximity thereto is among the most valuable and high priced property in the city. Block numbered 60 in the Fourth ward of the city of Milwaukee is bounded on the south by Grand avenue, on the east by Second street, on the north by Wells street, and on the west by Third street. Running east and west through the center of said block is a twenty-foot public alley, and there is also a public alley running north and south through the center of said block, of like dimensions. The lots in said block north of Grand avenue, as appears from the plat, are laid out fronting on Third street, and are approximately 50 feet in width and 150 feet long, terminating at the north-and-south alley above referred to. The southwest corner of lot 15 is the northeast corner of the intersection of Grand avenue and Third street. Lot 14 is located immediately north of lot 15; lot 11 is directly north of lot 14; and lot 10 is directly north of lot 11. While according to the original government sur-

vey lots 14 and 15 are 150 feet in length, it was ascertained
by a subsequent survey that the real length of such lots is
150 feet and 8 inches. Lots 10, 11, 14, and 15 were origi-
nally owned by one John Ogden, and from time to time vari-
ous portions of said lots 14 and 15 were conveyed, so that
at the present time plaintiffs are the owners of the east 49
feet of such lots, the defendant *Straus Building Corporation*
is in possession of the west 40.75 feet of said lots under a
ninety-nine-year lease; the defendant *Henry M. Thompson*
owns the 20 feet directly east of the property possessed by
the *Building Corporation;* and the property lying between
the plaintiffs' tract and that of the defendant *Henry M.
Thompson* is owned by *Stella D. Thompson,* wife of the
defendant *Henry M. Thompson.*

The court found, and the evidence shows, that in 1871
John Ogden conveyed by warranty deed to Henry Colclough
and Colin Campbell the east 38 feet and 8 inches of the
west 100 feet of said lots 14 and 15, which deed contained
the following reservation:

"This conveyance is made and accepted, subject to re-
served right to all the respective owners of different portions
of said lots 14 and 15 to a common alley or passageway to
and from Third street over the north ten feet in width of
the west two-thirds of said lot 14, which said passageway,
with width aforesaid, next south of and along the north line
of the west two-thirds of said lot 14 is to be kept open for a
passageway to and from Third street for the common benefit
of owners of the respective portions of said lots 14 and 15,
and for use of their respective heirs, assigns, and lessees,
and which passageway, with width aforesaid, the parties
hereto agree to open and keep open."

The foregoing constitutes the first conveyance made by
John Ogden of any portion of lots 14 and 15.

That in 1901 one John A. Becher, who, after a number
of intermediate conveyances, became the owner of the prop-
erty last above described, executed a warranty deed of such

property to the defendant *Stella D. Thompson*, which said deed contained the following clause: "Subject to a right of way over the north ten feet in width of the west two-thirds of said lot 14 to and from Third street."

That in 1875 John Ogden conveyed to Henry Colclough, by warranty deed, the west 41 feet and 4 inches of said lots 14 and 15, which deed contained the following reservation:

"This deed is made and accepted subject to the reserved right of the respective owners of the different parts and portions of said lots 14 and 15 to a common alley or passageway to and from Third street on the west of said lots over the north ten feet in width of the west two-thirds of said lot 14, which said passageway with the width aforesaid next south of and along the north line of the west two-thirds of said lot 14 is to be kept open for a passageway to and from Third street for the common benefit and use of the respective owners of the respective portions of said lots 14 and 15 and for the use of their respective heirs, assigns, and lessees, by the owners of the respective portions of the west two-thirds of said lots."

That the property last above described was, in the year 1880, conveyed to one A. R. R. Butler by warranty deed, "subject to the reserved right of the respective owners and occupants of said lots 14 and 15 to a common alley or passageway to and from Third street over the north ten feet in width of the west two-thirds of said lot 14."

That in September, 1880, said Butler conveyed the property purchased by him to his son John A. Butler, by warranty deed, such deed containing the same reservation as was included in the deed from Colclough to A. R. R. Butler.

That in 1911 said John A. Butler conveyed, by a ninety-nine-year lease, the premises owned by him to Max Routt, Morris Miller, and Martin Tullgren, and such lease contained the following provision: "Subject to a ten-foot alleyway on the north end of said demised premises;" and further provided for the construction of a building upon the demised premises, "such building, as well as any future building that

may be erected or constructed upon said demised premises, . . . shall substantially cover the whole of said demised premises except said alleyway and except the necessary air and light shafts." The obligations of said ninety-nine-year lease by the terms thereof were made binding upon the heirs, executors, administrators, and assigns of the respective parties.

That in 1913 the provision with respect to the alley was by the parties to the lease modified so as to give to the lessees, during the term of the lease, the right to do with and in respect to the said north ten feet of the demised premises whatsoever the said lessor might lawfully do.

In January, 1891, John Ogden died testate, and pursuant to the provisions of his will and certain conveyances made by and between the heirs and devisees the title to the east 50 feet of said lots 14 and 15 was vested in the plaintiffs, *George W. Ogden* and Henry M. Ogden, sons of the deceased, and the title to the east 20 feet of the west 61⅓ feet of said lots was vested in John G. Ogden, also a son of said deceased.

That Henry M. Ogden died in 1921, testate, and his interest in the property above described, pursuant to the will, passed to his widow, *Minnie M. Ogden,* and his son *Elliott M. Ogden,* as trustees during the life of the widow, with the remainder in fee after her death to his said son, *Elliott M. Ogden,* and his daughter, *Alice G. Ogden.*

That in 1901 John G. Ogden conveyed the east 20 feet of the west 61⅓ feet of said lots 14 and 15 to the defendant *Henry M. Thompson* by warranty deed, and such deed contained the following clause: "Subject to an alley or passageway over the north ten feet of said part of lot 14."

That in 1901 *Henry M. Thompson,* the owner of the twenty-foot tract, and John A. Butler, the owner of the corner, exchanged quitclaim deeds, in which deeds the wives of the respective parties joined, for the purpose of definitely fixing the north-and-south boundary line between their re-

spective properties, which deeds will be more particularly referred to and commented upon in the opinion.

That in 1902 *George W. Ogden* and Henry M. Ogden, then the owners of the east fifty feet of said lots 14 and 15, entered into a certain party-wall agreement with the defendant *Stella D. Thompson,* which agreement will be more specifically referred to and commented upon in the opinion.

That about two years after the execution of the said party-wall agreement a second agreement was entered into by the same parties, ostensibly for the purpose of more definitely and permanently fixing and establishing the north-and-south line between the properties of the parties, and such second agreement will also be more extensively referred to and commented upon in the opinion.

For the appellant *Straus Building Corporation* there were briefs by *Glicksman, Gold & Corrigan* of Milwaukee, and oral argument by *Walter D. Corrigan* and *Nathan Glicksman.*

For the appellants *Thompson* there was a brief by *Olwell & Brady* and *George A. Gessner,* all of Milwaukee, and oral argument by *Lawrence A. Olwell.*

For the appellant *Hotel Wisconsin Realty Company* there was a brief by *Irving A. Fish* and *Samuel M. Field,* both of Milwaukee, and oral argument by *Mr. Fish.*

For the respondents there was a brief by *Fawsett, Smart & Shea,* attorneys, and *Charles F. Fawsett, Edward M. Smart,* and *Charles E. Monroe,* counsel, all of Milwaukee, and oral argument by *Mr. Smart.*

The following opinion was filed January 13, 1925:

DOERFLER, J.   It is contended by the defendants *Thompson* and the *Building Corporation* that by the execution of the so-called party-wall agreement and the subsequent agreement above referred to, the plaintiffs lost all their rights in and to the alley which had been reserved, and that therefore plaintiffs' cause of action as against such defendants must fall and their complaint be dismissed.

In view of the importance and significance attached to the party-wall agreement by all of the appellants herein, the same will be set out in full, omitting the signatures:

"Memorandum of agreement made this 20th day of March, A. D. 1902, by and between *George W. Ogden* and Mary E. Ogden, his wife, and Henry M. Ogden and *Minnie M. Ogden,* his wife, of Milwaukee, Wisconsin, as the first parties, and *Stella D. Thompson,* of Mosinee, Wisconsin, as the second party.

"Witnesseth: Whereas the said parties own contiguous property situated in block sixty (60) in the Fourth ward of the city of Milwaukee and county of Milwaukee and state of Wisconsin, and contemplate improving the same by the erection of permanent buildings thereon:

"Now, therefore, in consideration of one ($1) dollar by each of said parties to the other party in hand paid, receipt of which is hereby confessed and acknowledged, the said parties do hereby make the following party-wall agreement:

"The said parties agree to locate and build jointly a twenty-four (24) inch brick wall, the center of which shall extend from the south line of the east fifty (50) feet of lots fourteen (14) and fifteen (15) in block sixty (60) in said Fourth ward northwardly for a distance of one hundred (100) feet. The center line of said party-wall is to be parallel with the eastern boundary of said east fifty (50) feet of lots fourteen (14) and fifteen (15) and is to be distant west therefrom forty-nine (49) feet.

"Said second party is to pay one half of the cost of constructing said party-wall and foundations therefor for ninety (90) feet from the south end thereof.

"The said party-wall is to be built in accordance with the ordinances of the city of Milwaukee of brick, and is to be suitable for an extension thereof upwards to a height of eight stories.

"It is to be at present erected to the height of three stories and basement. If either party hereafter desires to extend the said wall to a height suitable for a six-story building, said party shall have the privilege of so adding to the wall, and the parties hereto are to divide the expenses thereof. If either party hereafter desires to increase said wall to the height suitable for an eight-story building, they, or she, shall have the right and privilege of so doing at their, or her,

own expense, but providing that whenever the other party desires to make use of said addition to said wall above the sixth story, they, or she, will pay one half the cost of said extension above the sixth story.

"And the first parties hereby grant, convey, and warrant to said second party the west twelve (12) inches of said east fifty (50) feet of lots fourteen (14) and fifteen (15) in block sixty (60), and hereby convey and quitclaim to said second party all land or real estate, whatever it may be, lying between the westerly boundary of said east fifty (50) feet of said lots fourteen (14) and fifteen (15) in block sixty (60) and the property owned by said second party in the said lots lying west of said east fifty (50) feet.

"The said first parties are to maintain the eastern half of said party-wall in good repair, and the said second party is to maintain the western half of said party-wall in good repair.

"The said center line of said party-wall is to remain the fixed and established boundary between the property owned by said first parties and said second party, respectively, the said first parties owning all east thereof, and the said second party owning all west thereof.

"This agreement shall extend to and be binding upon the heirs, executors, administrators, and assigns of the parties hereto, respectively, and shall be an agreement running with the land hereinbefore referred to.

"In witness whereof the said parties have hereunto signed and sealed this agreement the day and year first above written."

It will thus be observed that included in the party-wall agreement and as an essential part thereof there was a conveyance, in terms substantially of a statutory warranty deed, of one foot of the Ogden property to *Mrs. Thompson.* Prior to such agreement *George W. Ogden* and Henry M. Ogden were the owners of the east fifty feet of said lots 14 and 15, with their east line forming the west boundary line of the north-and-south alley, the north ten feet of the west line of their property forming the eastern terminus of the east-and-west reserved alley, so that the north ten feet of their property abutted on such alley.

In addition to the conveyance above referred to, the party-wall agreement, in terms of a quitclaim deed, also provided for a conveyance to *Stella D. Thompson* of all land or real estate, whatever it may be, lying between the westerly boundary of said east fifty feet of said lots 14 and 15 in block 60 and the property owned by said *Stella D. Thompson.*

Briefly stated, the position of counsel for the *Thompsons* and of the *Building Corporation* is to the effect that, under the provisions of sec. 2208 of the Statutes, the language used in the conveyance by warranty deed had the effect of a statutory warranty deed, pursuant to which the Ogdens covenanted, first, that they were lawfully seized of the strip conveyed; second, that they had good right to convey; third, that they guaranteed quiet possession; fourth, that the property conveyed was free and clear of incumbrances; and fifth, that they warranted the title and possession; and that by virtue of such conveyances they are estopped from denying the legal effect of the language used, and are thus effectually prevented from making any claim whatsoever as against *Stella D. Thompson,* who became the owner and the possessor of such strip, for a valuable consideration, under such warranty deed. Further, it is argued by counsel for the *Thompsons* and for the *Building Corporation* that inasmuch as *Stella D. Thompson* became the absolute owner under such warranty deed of said one-foot strip, the property which the Ogdens still retained, being the east forty-nine feet of lots 14 and 15, became effectually and permanently separated and removed from such ten-foot alley, and that the easement in said alley which had been reserved for the benefit of the Ogdens was no longer appurtenant to their property and was therefore lost to them, and that it was the intention of the parties to produce such effect by the conveyances above referred to.

Further, it is contended that by the conveyance in the form of a quitclaim deed the Ogdens intended to and did convey all their property and interest in and to any overrun

that might lie between the west line of the twelve-inch strip and the true line of *Mrs. Thompson's* property.

If, instead of executing a party-wall agreement in which the conveyances above referred to were incorporated, the Ogdens had merely executed a warranty deed of the one-foot strip, the argument of counsel for the *Thompsons* and the *Building Corporation* would be rather plausible and persuasive; but the strip referred to was not conveyed by a separate and independent document, but by one which was a part of and a mere incident to an agreement which was essentially a party-wall agreement. In construing this party-wall agreement, the agreement as a whole, and every constituent part thereof, and the relations of the various parts to each other and to the whole, must be taken into consideration, in order that a true construction may be arrived at. Reading the agreement, therefore, in the light of what has been said, we find, first, a recital that the parties own contiguous property, and contemplate improving the same by the erection of permanent buildings thereon. Then follows a provision by which it is declared that, in consideration of one dollar by each party paid to the other, they "hereby make the following party-wall agreement." The portions of the agreement just referred to are persuasive of what actuated the parties to enter into the agreement and the purpose for which it was executed. The properties were contiguous; they were valuable, and were located in the best business district of the metropolis of the state. From an economic standpoint such property can only be made productive and profitable by the erection thereon of large, expensive, and substantial buildings. Bearing in mind the location of the property and its great value, the importance of establishing a fixed and definite division line becomes apparent, as does also the advisability of building a party-wall, which facilitates the location of a definite line and is productive of economy. The very nature of a party-wall agreement embraces within it not only the idea of a permanent

division line, but establishes quite conclusively, by the very act, a division line with a disavowal of ownership by each party beyond the confines of such line. Had the parties stopped at this point, proceeding in their agreement to define and describe the proposed wall and the respective obligations of each party to such wall, the division line, by the very acts of the parties, would have been definitely fixed and their property rights determined. But in order to remove any possible or conceivable doubt with respect to the main object and purpose which the parties had in mind, it was deemed advisable to convey to *Mrs. Thompson* one foot of the Ogden property, so as to enable her to build her portion of the party-wall thereon, thus leaving the fee title of forty-nine feet of the Ogden property in the Ogdens, of which the west one foot thereof was appropriated and set aside upon which to build the balance of the two-foot wall. The agreement then proceeds as follows:

"The said center line of said party-wall is to remain the fixed and established boundary between the property owned by said first parties and said second party, respectively, the said first parties owning all east thereof and the said second party owning all west thereof."

The agreement was then made binding upon the respective heirs, executors, administrators, and assigns of the parties, and was made perpetual as an agreement running with the land.

It is contended by counsel for the *Thompsons* and the *Building Corporation* that the agreement itself is clear and unambiguous, and as such must be deemed fully expressive of the intentions of the parties, and that parol evidence is inadmissible to vary its terms, and that the court erred in admitting parol testimony on the trial. Assuming the position of counsel to be correct, the rule thus contended for would be clearly applicable. While the agreement specifically fixes the center line of the wall and defines its width and length and limits its height, and while it provides for the material

to be used in its construction, and further imposes certain obligations on the parties with respect to the payment of the original cost and the maintenance, it must be admitted that nothing whatever is contained within its provisions, in express terms, which may be referable to the easement of the ten-foot alley, which at the time was not only appurtenant to the property of the *Thompsons* and the *Building Corporation*, but also to the property of the Ogdens. By the very terms of the agreement each party was obligated to pay one half of the cost of construction of the south ninety feet of the wall to the height to which the wall was to be built. The cost of the remaining ten feet of the wall which extended over the reserved strip was to be borne solely by the Ogdens. We have thus, by the deliberate acts of the parties, included in this agreement an obligation with respect to the north ten feet of the wall which differs materially from that which is provided for in the building of the south ninety feet of the wall. So that in reading this agreement fully and considering it as a whole, and also the various parts thereof, and the relation of such parts to each other and to the whole, a doubt naturally arises in the mind of the reader as to the reason for this difference, which also involves the character of the wall to be constructed over this alley.

In *Klueter v. Joseph Schlitz B. Co.* 143 Wis. 347, 128 N. W. 43, it was held, as shown by the sixth and seventh paragraphs of the syllabus:

"Extrinsic evidence is not admissible for the direct purpose of creating ambiguity in the language of a written contract which is plain, viewed exclusively, but that does not militate against the rule that extrinsic evidence is proper to apply a contract, plain in its literal sense, to the subject with which it deals, and, if the effect is to disclose ambiguity, like evidence to show the circumstances characterizing the making of the contract.

"From the foregoing the rule results that ambiguity in a written contract calling for construction may arise as well from words plain in themselves but uncertain when applied

to the subject matter of the contract, as from words which are uncertain in their literal sense."

From what has heretofore been said, it appears that the ambiguity in the instant case arises from the very wording of the agreement when construed in its literal sense, but that when we apply the agreement to the subject matter such ambiguity is clearly established, and the rule laid down in the *Klueter Case* is therefore applicable.

In the case of *Wallis v. First Nat. Bank,* 155 Wis. 306, 315, 143 N. W. 670, this court, in a very similar case, uses the following language in its opinion:

"The task of the court is to determine as best it may what the parties intended by their contracts . . . by reading them in the light of the circumstances which surrounded the parties when they were made. *Barkhausen v. C., M. & St. P. R. Co.* 142 Wis. 292, 298, 124 N. W. 649, 125 N. W. 680; *Shepard v. Pabst,* 149 Wis. 35, 45, 135 N. W. 158. These contracts are not ordinary deeds. They were apparently made in duplicate and signed by all the parties, so that all are bound by the covenants and recitals contained therein."

In the construction of contracts the cardinal principle to be borne in mind is to ascertain the intention of the parties. The evidence shows the existence of this alley as far back as 1855. Up to the time that John Ogden made his first conveyance of a part of lots 14 and 15, this alley was used by him as such and recognized as an appurtenance to lot 14. For a considerable period of time after 1855 the north and south sides of the alley were fenced, thus indicating that the owner clearly intended to reserve it in connection with his use of the balance of his property. Approximately in 1850 John Ogden erected a building on the corner, which remained until 1899, when it was torn down by Butler, the then owner of the property. The building extended to the south line of the alley, and had openings towards the north so as to facilitate the receiving and delivering of merchandise and commodities from that side. Thereafter Butler erected a

new building and constructed it so that it extended back from Grand avenue a distance of ninety feet, and the building also had openings towards the north for the same purpose, and was used in a similar manner as was the original building.

In 1867 there was located upon the property now owned by the plaintiffs a carriage shop, which extended to the north line of lot 10. In the same year a building was constructed on the *Henry M. Thompson* tract, south of the alley and fronting on Grand avenue, which remained thereon when *Thompson* purchased this tract. In 1871 a three-story building was erected upon the *Stella D. Thompson* tract, which still remained when she purchased the property, and this building extended back to the south line of the alley. The buildings on the two *Thompson* tracts had openings in the rear and were used for the reception and delivery of merchandise and other commodities.

In about 1919 *Mrs. Thompson* reconstructed her building, and that building, together with the building on the twenty-foot strip, were remodeled and leased to the defendant Breithaupt Company. In this year *Mrs. Thompson* for the first time made use of the party-wall. As will appear from the ninety-nine-year lease of the corner property, now occupied by the *Building Corporation*, the existence of this alley was expressly recognized, so that it is fully established that from the time when John Ogden made the first sale of a part of lots 14 and 15, up to the year 1923, when the *Building Corporation* attempted to build upon or over this alley, not only did the various title deeds and the ninety-nine-year lease provide for an express reservation of the alley, but the alley was used in common by the owners and occupants of all the various portions of lots 14 and 15 as a common alley or passageway, and during all this period of time the alley remained open from the surface to the sky.

It also appears from the evidence that prior to the time of the negotiation of the party-wall agreement the two Ogdens,

who were then the owners of the east fifty feet of lots 14
and 15, contemplated erecting a five-story building upon
their property to take the place of the building which had
stood thereon prior thereto, and which was used for a car-
riage factory, and which had been destroyed by fire.   Plans
for such building had been prepared, and work on the exca-
vation had been begun, when the Ogdens and *Henry M.
Thompson,* as the agent for his wife, entered into negotia-
tions for the erection and maintenance of a party-wall.  *Mrs.
Thompson* at that time had located upon her lot a brick
building, and it appears that the east wall of such building
did not run in a straight line, parallel with the west line of
the north-and-south alley, inasmuch as the north portion of
the wall gradually swerved towards the west, away from the
north-and-south line.   The plans of the Ogdens showed a
building 100 feet in length, extending over the ten-foot alley,
and in the portion of the wall shown on the plans over such
alley there were indications of openings in the basement and
in the upper floors for large and substantial windows, indi-
cating beyond all controversy that there was no intention
whatsoever on the Ogdens' part to abandon the rights they
had in the alley.   The existence of these plans was known to
*Mr. Thompson,* and no objection whatsoever was raised to
the same.   It was suggested, however, that, inasmuch as the
*Thompson* wall was not constructed and maintained on a due
north-and-south line, it would be advisable for *Mrs. Thomp-
son* to purchase one foot of the property belonging to the
Ogdens, with a view of building thereon her portion of the
proposed wall.   The parties thereupon came to an under-
standing upon the subject, and the party-wall agreement was
drafted and executed.  The Ogdens then modified their orig-
inal plan in accordance with the new agreement.   The wall
as it was actually constructed contained the openings hereto-
fore referred to and shown upon the original plans, and
windows were actually set into the wall, facing the alley, in
the basement and in the upper floors.   All this was done with

248    SUPREME COURT OF WISCONSIN.    [June

Ogden v. Straus. Building Corporation, 187 Wis. 232.

the knowledge, consent, and acquiescence of *Mrs. Thompson,* and at no time were any objections made or protests entered thereto.  No stronger evidence could be produced to indicate the intentions of the parties with respect to this alley.  It was recognized and utilized as an alley at all times until this litigation was started.

Under the provisions of the party-wall agreement the Ogdens and *Mrs. Thompson* were obligated to each pay for one half of the cost of construction of the south ninety feet of the wall to the height of three stories.  The Ogdens were obligated to pay the entire cost of that portion of the party-wall which extended over the alley.  How, we ask, under such facts and circumstances, can it be logically claimed that there was any manifestation of an intention on the part of the Ogdens to relinquish or abandon their rights to the alley?  While the wall itself to its full length must be deemed a party-wall because one half of it is located upon *Mrs. Thompson's* property, it becomes clear that the parties did not have in mind at that time that *Mrs. Thompson* would have the use of the ten-foot alley, because such alley was subject to the easement in favor of the Ogdens.  That the easement continued both before and after the execution of the agreement, and was so contemplated by the parties, is convincingly demonstrated by the manner in which that portion of the wall over the alley was constructed, with the knowledge, acquiescence, and consent of *Mrs. Thompson.* In reading the contract, therefore, in the light of the building plans of the Ogdens, and bearing in mind *Mrs. Thompson's* knowledge and acquiescence, not only to the plans but the actual construction of the wall, and the long continuance and uninterrupted use of this alley as an appurtenance to the owners of lots 14 and 15, and taking into consideration all the other surrounding facts and circumstances, we are forced to the irresistible conclusion that with *Mrs. Thompson's* consent an easement was created for the benefit of the Ogdens

so as to enable them to have access to the alley and utilize it for the purpose for which this alley was created.

"It has been held . . . that a part owner of a party-wall who permits the cutting of openings and windows therein, and by his conduct induces the belief that he does not object thereto, is estopped to object to the continuance and maintenance thereof, in the absence of injury therefrom, or desire to use the wall." 20 Ruling Case Law, 1095, 1096, and cases cited in note.

It is not improbable that at the time the agreement was made the parties had in mind that some time in the future the persons having an interest in the easement might relinquish the same so as to enable all of them to utilize the alley for building purposes. When the party-wall was built *Mrs. Thompson's* building had stood upon her property for a long period of time. She was not then ready to tear down her east wall and to make use of the party-wall; on the contrary, her intentions were to permit such east wall, for an indefinite period in the future, to remain intact. For a period of almost twenty years *Mrs. Thompson's* east wall was permitted to remain as it was in 1902. Even when her building was remodeled so that it might be used conjointly with her husband's property, and when for the first time she had occasion to and did make use of the party-wall, no attempt whatsoever was made to utilize that portion of the property extending over the alley.

But counsel for the *Thompsons* and the *Building Corporation* further argue that the party-wall agreement provides that if either party desires to extend the wall suitable for a six-story building such privilege is accorded, with the obligation that the parties divide the expense, and if the wall is further extended so as to rise to a height of eight stories, the party making such extension must pay therefor, with the privilege granted to the other party to make use of such wall at any time, in which event he must pay for one half

the cost of such extension above the sixth story; and that such provisions, in the light of the language used, can only be construed as an obligation on the part of *Mrs. Thompson* to pay for one half of the entire wall between the third and the sixth stories, and one half of the height above that when she makes actual use thereof. The portion of the agreement thus referred to, in its literal sense, would tend to bear out such contention of counsel, and the agreement, if so construed, would indicate that the parties intended that a building might be constructed over *Mrs. Thompson's* portion of the alley. Here the significance of the party-wall agreement under which the Ogdens became obligated to pay for that portion of the wall over the alley becomes important. If the agreement for the wall over the alley had provided that the cost be borne by both parties thereto, a different situation would be presented. Under the agreement the cost of the wall over the alley was to be borne solely by the Ogdens. Therefore, when the agreement proceeds and creates an obligation for the extension of the wall to additional heights, the inference becomes logical that *Mrs. Thompson* would be obligated, with respect to such additions, only in the same manner and in the same proportion as her obligation existed with respect to the original three-story wall. This would mean that the Ogdens would be obliged to bear the entire expense of the extensions upward of the wall over the alley, while *Mrs. Thompson* would be obliged to bear one half of the expense of the south ninety feet of the wall. That this is the correct construction is borne out by all the surrounding facts and circumstances pertaining to this alley. No reason can be advanced why the Ogdens should bear the entire expense of the wall covering this ten-foot strip and *Mrs. Thompson* bear one half of the expense of the additions of this portion over the third story, particularly when we consider that under conditions then existing she could make no use what-

ever of such portion of the wall. This conclusion is irresistible, and is logical in the light of the evident intent of the entire party-wall agreement; and although the learned trial judge in his findings did not adopt such view we now adopt it as the proper construction of this agreement.

The conveyances in the agreement, as evidenced by the warranty and quitclaim deeds, were not absolute and unqualified, but were executed for the purpose of facilitating and carrying out the main object of the agreement, which consisted of the construction and maintenance of a party-wall and the definite and permanent establishment of a division line. The agreement was drawn by able counsel. While it is not as definite, specific, and certain as it might have been made under the circumstances, nevertheless it must be assumed that not only the parties, but counsel, were fully aware of the existence of this alley easement at the time. Counsel are merely human agencies, and in the performance of their duties are actuated by a desire to embrace everything that may be essential in the discharge of their obligations; but having their minds centered upon the principal object and purpose to be accomplished, incidental matters and their bearing upon the main object are not always fully comprehended, and thus arises the frequent necessity for construction by the courts; and in an effort for such construction the court in a case like this is bound to determine not only from the wording of the contract, but also from all the surrounding facts and circumstances, what the real intentions were; and such being determined, the contract will be construed accordingly. This is what we have endeavored to do in the instant case with respect to the party-wall agreement, and our conclusions as above indicated are the result of a careful review of both the law and the facts in the case.

The learned counsel for the *Thompsons* and the *Building Corporation* firmly assert that, in viewing the equities involved, the trial court overlooked and disregarded funda-

mental principles of law.   Laws exist for the benefit of the public in order that justice may be done.   A careful and painstaking review of this party-wall agreement as to all of its essential features leaves in the mind of the reviewer an abiding conviction that the thought at no time was entertained by the parties and the counsel who drew the agreement that the effect thereof would be a deprivation to the Ogdens of the use of the easement in the alley.   On the contrary, the impression becomes very pronounced that a continuance of this use in the future was contemplated, and that *Stella D. Thompson* not only consented to but created an easement over this one-foot strip so as to enable the Ogdens to continue to enjoy the easement.   The common law, in a case like this, which permits extrinsic evidence to be introduced in order to apply a contract to the subject with which it deals, and which allows the surrounding facts and circumstances to be shown, and also permits the introduction of evidence showing how the parties themselves treated the contract, is just as fundamental as is the rule that oral testimony cannot be introduced to vary the terms of a written contract plain and unambiguous upon its face.   There has been no bending or thwarting or disregard of the fundamental rules of evidence, but an application of the same as they were justified by the peculiar requirements of the case.

About one year after the Ogden building had been completed the Ogdens and *Mrs. Thompson* supplemented the party-wall agreement by another agreement, known as the copper-spike agreement.   In the construction of the party-wall certain monuments were fixed and imbedded in the center line of said wall, so as to establish permanent monuments with respect to the division line.   This copper-spike agreement, in substance, recites the ownership by the respective parties of certain portions of said lots 14 and 15; refers to the execution of the party-wall agreement; also recites that it is desirable to modify and add to said agreement by establishing a more accurately determined boundary

line between the property of the said parties, and then proceeds as follows, to wit:

"Now, therefore, the boundary line between the property of said owners is hereby established as being a line running north and south forty-nine (49) feet west of the east line of said lots and parallel to the eastern boundary of said lots, and said line has been mutually surveyed by said parties and all of the parties hereto have definitely agreed and have established a landmark for the same which shall be perpetual between them, said landmark being the center of a stone monument, which monument is buried and fixed in the basement floor under the sidewalk forty-nine (49) feet west of the east line of said lot fifteen (15) and seventeen and one-half (17½) inches south of the south line of said lot fifteen (15); and also by another landmark which consists of a certain copper pin sunken into the face of the brickwork of the party-wall on the south line of said lot fifteen (15), one foot above the street grade facing Grand avenue; . . . And the said boundary line hereby established is to run north and south through said monuments."

The agreement further contains a quitclaim to the first party (*Mrs. Thompson*) of all that portion of said lots which lies west of said line, and a quitclaim to the Ogdens of all that portion which lies east of said line; further, that the party-wall agreement as modified shall remain in force as a perpetual party-wall agreement.

With respect to this latter agreement, the *Thompsons* and the *Building Corporation*, both in their pleadings and upon the trial, took the position that the Ogdens quitclaimed and relinquished their rights to the alley. Much of what has been heretofore said with respect to the party-wall agreement is equally applicable to this contention; and the party-wall agreement being referred to in the latter agreement, both agreements must be construed together in order to arrive at the intention of the parties. The dividing line between the property of the Ogdens and *Mrs. Thompson* is definitely established and fixed by the party-wall agreement, and it would appear that no further agreement was necessary upon

that subject. The monuments, however, having been inserted along the center line of the party-wall, it evidently was deemed desirable not only to confirm the line already established, but, to make doubly sure that no mistake had been made, a line was agreed upon through the center of these monuments and accepted by the parties as a permanent division line. To establish such line, based upon the monuments, was the sole object of the agreement, and the agreement so recites. When the copper-spike agreement was entered into, the *Thompsons* had no interest whatsoever in any land or property lying east of the north-and-south center line of the party-wall. The party-wall agreement having definitely fixed the dividing line of the properties of the parties, the Ogdens had no lands west of such dividing line excepting only the right to the easement in the alley. Therefore it is claimed by counsel for the *Thompsons* and the *Building Corporation* that the quitclaim of the Ogdens operated as a release of their rights to the alley. An easement like the one herein involved is an appurtenance to lands. It is a right which the owner of the dominant estate has in the lands of the servient estate, and both classes of estates are necessary to create such an easement. In 19 Corp. Jur. 938, 939, it is said:

"A pure easement can exist only as an appurtenance to land, and it follows that an existing easement cannot be severed from the land to which it is appurtenant and made the subject of a separate agreement or a reservation. Such easement cannot be converted into an easement in gross." See, also, *Reise v. Enos,* 76 Wis. 634, 45 N. W. 414; *Wood v. Woodley,* 160 N. C. 17, 75 S. E. 719, 41 L. R. A. n. s. 1107.

These authorities clearly establish the fact that the easement did not pass to *Mrs. Thompson* by this quitclaim deed of the Ogdens. Here, also, all of the testimony introduced for the purpose of showing the physical situation as it then existed, and all the other surrounding facts and circum-

stances, and the acts of the parties, must be considered in order to show and establish the main purpose of this agreement, to which, as in the party-wall agreement, the quitclaims were mere incidents. These quitclaim deeds constituted mere disavowals by the parties that they made any claim to real estate on the other side of the dividing line, for the sole and only purpose of finally and permanently fixing the dividing line. The quitclaims were incidental to the establishment of the line, and when they accomplished this purpose they had no other or further object to serve.

On the 29th day of May, 1903, John A. Butler was the owner of approximately the west forty feet of said lots, and *Henry M. Thompson* owned approximately twenty feet lying east thereof. The deed to A. R. R. Butler and his deed to John A. Butler conveyed the west forty-one feet and four inches of said lots. The original building upon this lot projected on the south seven inches to the west over the line and eleven inches to the north. The building upon the *Henry M. Thompson* tract also projected over his line on the north towards the west a distance of seven inches. The parties, therefore, were anxious to establish a definite division line between their properties. At this time the importance of Grand avenue as a retail business center had been fully established. Every one familiar with the situation could readily prophesy that in the near future lots 14 and 15 would be occupied by large, substantial business blocks, and both *Mr. Thompson* and Mr. Butler had special reason to realize such fact. The encroachment of the wall of a large building upon the adjoining property may result in rather serious and disastrous consequences. In order to avoid this, and to permanently set at rest any dispute as to a proper division line, these adjoining property owners exchanged quitclaim deeds. The court, with respect to these deeds, found as follows:

"That thereafter, because of some uncertainty as to the actual location of the dividing line between the two parcels

of land in said lots 14 and 15 owned and actually occupied by said *Henry M. Thompson* and said John A. Butler and for the purposes of defining and establishing the dividing line between the parcels owned by them respectively and of determining the ownership of a small parcel of unoccupied land between their buildings, said John A. Butler and *Henry M. Thompson,* on or about the 29th day of May, 1903, exchanged quitclaim deeds for stated considerations of one dollar and other good and valuable considerations, in which deeds their respective wives joined for the purpose of releasing any right of dower in the respective premises so conveyed, . . . and which deeds expressly established as the dividing line between said parcels, a line commencing at a point in the south line of said lot 15 and 40.75 feet east of the northeast corner of Grand avenue and Third street as at present existing, and running north from said point and parallel with the east line of Third street as at present existing to a point in the north line of said lot 14, and for the purpose of so establishing such line, said *Thompson* quitclaimed to Butler all property to the west of said line, and said Butler quitclaimed to *Thompson* all property to the east of said line."

*Mr. Thompson* testified that the sole object of this exchange of quitclaim deeds was to definitely establish the boundary line between his property and the property of Butler. It is the contention of the *Building Corporation* that this mutual exchange of quitclaim deeds effected a release of each party to the easement in the alley. *Stella D. Thompson,* however, was not a party to the quitclaim deed of her husband excepting for the purpose of joining him in order to release her dower interest. She owned no property adjoining the Butler property. She was not directly interested in any controversy which Butler and her husband had with respect to the dividing line of their properties. Under the reservations contained in the original deeds of John Ogden and in subsequent deeds, this ten-foot alley was reserved for the benefit and use of all of the various owners of lots

14 and 15. Such deed from *Henry M. Thompson* to Butler, therefore, could not affect the rights of either *Mrs. Thompson* or of the Ogdens in the alley, nor could the Butler deed have such effect. It was therefore, under all circumstances, necessary, assuming that this exchange of quitclaim deeds had the effect that counsel for the *Building Corporation* claim for it, to keep this alley open for the benefit and use of *Mrs. Thompson* and of the Ogdens. This in itself would act as an effective bar to the rights of the *Building Corporation* to build on and over the alley. John A. Butler, who executed one of the deeds, never dreamed for a moment that these alley rights were released by these deeds. He and the *Thompsons,* together with the Ogdens, for a period of over twenty years thereafter, continued to make use of this alley, and recognized its existence and the rights of the various owners of lots 14 and 15 with respect thereto. When he conveyed his property under the ninety-nine-year lease he carefully provided in such lease for a reservation of such alley. The lease also contained a provision requiring the lessee to erect and construct a building upon the property within a specified period of time, and that "such new building, as well as any future building that may be erected or constructed upon said demised premises, pursuant to the requirements of or under any of the provisions of this lease, . . . shall substantially cover the whole of said demised premises except said alleyway and except the necessary air and light shafts." The terms and conditions of such lease were also made binding upon the heirs, executors, administrators, and assigns of the respective parties. Until shortly before the erection of the building upon the Butler property no claim was ever made by the lessee under the ninety-nine-year lease, or its assignees, that the alley rights had been released. Under such a situation, in view of what has been heretofore said on this branch of the case, and applying also that portion of the opinion referable to the dis-

pute between *Stella D. Thompson* and the Ogdens, how can it be successfully claimed that the *Thompsons* have released their alley rights? We conclude otherwise.

The *Building Corporation* and the *Thompsons* take the position in this case that the reservations referred to in the various documents involved are of such a character as to require a mere passageway, and that consequently they have a right to build over this easement at a sufficient height which will insure such passageway, and that such passageway, when so secured, meets the requirements of such reservation. On the contrary, the Ogdens and the *Hotel Wisconsin Realty Company* both take the position that the reservations imply an open alley from the surface upward to an unlimited extent, in order that those for whose benefit the reservations were created may enjoy the full privilege of light and air.

We have thus far assumed that the provisions in the various documents as to the easements created reservations and not exceptions. Counsel for the *Realty Company* take the position that these provisions referred to are in the nature of exceptions and not of reservations. The Ogdens, who perhaps would be more vitally interested in having such provisions decreed as exceptions, practically concede that they are reservations. There is a vital distinction between a reservation and an exception.

"A reservation, like an exception, is something to be deducted from the thing granted, narrowing and limiting what would otherwise pass by the general words of grant. Strictly, however, a reservation is the creation in behalf of a grantor of a new right issuing out of the thing granted, something which did not exist as an independent right before the grant, while an exception operates to withdraw some part of the thing granted which would otherwise have passed to the grantee under the general description, being a part of the thing granted and something *in esse* at the time of the grant, and the legal effect of the words of exception being merely to sever from that which is granted that which is excepted, so that the latter does not pass by the grant. In

short, by an exception some part is excluded from the conveyance and remains in the grantor by virtue of his original title, while a reservation creates a new right out of the subject of the grant and is originated by the conveyance. . . . The rule that a reservation must be something not in being, but newly derived from the thing granted, must not be understood as preventing the reservation of some right which the grantor previously enjoyed." 8 Ruling Case Law, 1089–1091, and cases there cited.

While it has frequently been held that where the word "exception" is used it may be construed as a reservation, and where the word "reservation" is used it may be construed as an exception, whatever may be the conclusion depends largely upon the language used with reference to the subject matter, in the light of the circumstances of each particular case. 8 Ruling Case Law, 1092, 1093, and cases there cited; *Bardon v. O'Brien,* 140 Wis. 191, 120 N. W. 827; *Rich v. Zeilsdorff,* 22 Wis. 544.

In the various documents containing provisions for this easement, the language itself is clearly expressive of a reservation and not of an exception. The very nature and character of the grants are such as to convey the fee title, reserving the easements for the benefit of the various owners of lots 14 and 15. The easements have been treated by all interested as reservations and not exceptions. The owners of the parcels have paid the taxes for the respective pieces owned by them during all these years, which covers the entire tract, including that portion embraced in the alley. That reservations were created is so plain that we have proceeded in this opinion upon that assumption, without previously considering the matter. Generally speaking, the reservations of the original grantor provide that "This conveyance is made and accepted, subject to reserved right to all the respective owners of different portions of said lots fourteen (14) and fifteen (15) to a common alley or passageway to and from Third street, . . . which said passageway with width aforesaid . . . is to be kept open for a

passageway . . . for the common benefit of owners of the respective portions of said lots fourteen (14) and fifteen (15), . . . and which passageway with width aforesaid the parties hereto agree to open and keep open." This clearly creates an easement not only for the benefit of the grantee, but also for all of the other owners of portions of said lots 14 and 15, and in legal effect made them tenants in common of this easement. If the sole language used in the reservation were confined to the term "passageway," the position taken by counsel for the *Building Corporation* and for the *Thompsons* would be more plausible. Both terms, "alley" and "passageway," however, are used. While where a passageway solely is created the easement is less broad and more restricted than when the word "alley" is used, nevertheless we cannot treat this reservation as though it merely used the word "passageway," and as though the term "alley" had been entirely omitted. Concededly, the alley is not. a public alley but a private alley.

We therefore are confronted with language which it is our duty to construe and which is ambiguous, and therefore we must resort, in order to arrive at a correct interpretation, to the surrounding facts and circumstances, and the acts of the parties themselves, in the same manner as was done in the construction of the various documents heretofore reviewed and treated in this opinion. The language of the learned trial court in its findings of fact on the question here presented is aptly expressive of our views and conclusions in the matter:

"In the light of all the characterizing circumstances under which said alley was reserved as established by the evidence and of the subsequent acts and conduct of all the parties and the conditions which now obtain, the general nature of which might reasonably have been anticipated at the time said alley was definitely reserved, I find that to prevent the impairment of the easement in said alley which has been acquired by the various owners of said lots 14 and 15 by virtue of the reservation under which said alley was created, it

is necessary that said alley or passageway should be kept open and unobstructed for its full width from the surface to the sky. Even if this were not strictly true as a matter of original construction of the instruments creating said alley, its long continued existence as an alley open to its full width from the surface up, the acts and conduct of all parties in apparently regarding and acting with reference to it as an alley which was required to be maintained and kept open from the ground up, and the extent to which such common understanding and apparent intention of all parties in interest for a period of upwards of fifty years has been acted upon throughout the changes that have taken place in the property abutting said alley, which is now fully built up on all sides, now requires such a construction in the absence of agreement between all of the parties in interest upon a different construction."

This court has also held that, in case of a reservation, the language used should be construed most favorably to the original grantor. *Green Bay & M. C. Co. v. Hewitt,* 66 Wis. 461, 29 N. W. 237; *Hemmis v. Consolidated W. P. & P. Co.* 173 Wis. 518, 181 N. W. 743. See, also, 2 Devlin, Real Estate (3d ed.) § 979, referred to in the opinion in the *Hemmis Case.*

The case of *Barber v. Allen,* 212 Ill. 125, 72 N. E. 33, is very similar to the instant case, and in that case in its opinion the court uses the following language:

"If the thing itself—that is, the alleyway as a distinctive body of land—is granted or reserved, then, of course, the person for whose use the grant or reservation is, has the right to the enjoyment of the light and air without obstruction from earth to heaven; but if there be but a passageway only, then the restriction is that there must be no such deprivation of the light and air as would interfere with the use of the way. . . . In the case at bar there seems to be a purpose to reserve an alleyway, which is designated by the reservation as a private alleyway, as contradistinguished from the mere right of passage, or the use of a way for the purposes mentioned, and this right, according to the provisions of the reservation, is to be a perpetual right, and is to be forever

maintained, and we are of the opinion that with such reservation, and as incident to it, is the unobstructed enjoyment of light and air."

Counsel for the *Building Corporation* urge upon this court that in the case of *Gulick v. Hamilton,* 293 Ill. 126, 127 N. E. 383, the court reverses itself with respect to the language used in the *Barber Case, supra,* and that therefore the law as laid down in the latter case no longer obtains in that state. It was said in the opinion in that case that:

"None of the abutting owners had respected the alley as an unobstructed one ten feet in width. . . . That the defendants in error had themselves encroached upon the strip with areaways built out eighteen inches, and between the areaways an unloading chute or cellar entrance which projected into the strip approximately three feet and six inches, leaving six feet and six inches for the uses of an alley, and a permanent building occupied by Leseure at the north end obstructed the strip two feet to the entire height of the building and for a width of twenty-two feet. The bill alleged the construction by the Walker Opera House Company over the alleyway, supported by iron columns and maintained until the year 1914, and stated that it did not interfere with free and unobstructed passage along the alleyway, and that any person having occasion therefor passed back and forth without hindrance until June 1, 1915, when the plaintiff in error began an excavation in the alley for the erection of his new building."

It was also testified by one of the defendants in error that when the plaintiff in error contemplated erecting his building the plans were exhibited to him and that he consented thereto. It is under such circumstances that the court held that a proper passageway complied with all the requirements of the easement. The court also distinguished between a public alleyway and a private alleyway, and in its opinion stated:

"If an alley is public, abutting owners have a right to light, air, and ventilation [citing authorities], but if the

alley is not public that is not true as a rule of law [citing authority], and the character and uses of a private alley can be fixed and regulated by the parties interested. . . . A reservation of light and air for the use of buildings will not be implied, but must ordinarily be expressed, although there must be no interference in that or any other particular with the proper use of a right of way within the terms of the grant. *Barber v. Allen*, 212 Ill. 125, 72 N. E. 33."

It will thus appear that the court expressly had in mind the case of *Barber v. Allen, supra,* but nowhere in the opinion is there any express statement or declaration showing that it was the intention of the court to modify or change the law as laid down in the *Barber Case*. The conclusions arrived at in the case are persuasive that the court was largely actuated by the actual physical facts and circumstances revealed by the evidence, and the manner in which the various owners of the property entitled to the passageway treated the same over a long period of time. As stated by the trial court, in substance, in the instant case, if the question were presented as an original proposition, independent of all the surrounding facts and circumstances and the acts of the parties and the long period of acquiescence, it might have construed this reservation differently; but in view of the long continuance of this alley as an open alley, and of all the surrounding facts and circumstances, together with the manner in which the alley was treated, and the long acquiescence for over a period of fifty years, it was constrained to hold that it was the intention of the parties that the alley shall remain open from the surface to the sky. We are of the opinion that the situation presented is aptly met by the language used in 9 Ruling Case Law, 786:

"It is also settled that where a grant of an easement is general as to the extent of the burden to be imposed on the servient tenement, an exercise of the right, with the acquiescence and consent of both parties, in a particular course or manner, fixes the right and limits it to the particular

course or manner in which it has been enjoyed." See, also, *Salisbury v. Andrews,* 128 Mass. 336, 345; *Irvine v. McCreary,* 108 Ky. 495, 56 S. W. 966.

The *Realty Company* is in possession of lot 11 and a part of lot 10 under a ninety-nine-year lease assigned to it by its predecessor, and it appears from the findings of fact, fully sustained by the evidence, that shortly after the making of said lease (August 1, 1912) the *Realty Company* erected and constructed the south portion of its hotel building upon said lot 11 and the south ten feet of lot 10, and that said building was completed in the month of October, 1913.

"That in order to enable said company, through its contractors, to carry on the work of wrecking the former building upon said premises and to proceed with the construction of its new hotel building, said company, through one of its contractors, obtained permission from the defendants *Thompson* to enter upon, and in the course of such work to use, the strip comprising the west two-thirds of the north ten feet of lot 14; that after such permission had been granted, the contractors of said Hotel Wisconsin Company entered upon said strip, made certain excavations therein, and by about February 1, 1913, placed therein three foundation piers upon underground piling, extending about five feet south of the south line of lot 11; that thereafter, and before the defendants *Thompson,* or the predecessors of the defendant *Straus Building Corporation,* discovered such encroachments, the said Hotel Wisconsin Company refilled said excavations and repaved said alley or passageway, and proceeded with the erection of its present building upon said foundation in such a manner that, according to survey, the south wall of said hotel building as said wall appears above the pavement at the street level is upon the south line of said lot 11, so that certain parts of said hotel building . . . project upon said ten-foot strip, comprising said alley or passageway, and to the south of said south line of said lot 11 as so determined by such survey, namely:

"The terra cotta column at the southwest corner of said building, the cornice at the top of the second floor, the cornice at the top of the ninth floor, the terra cotta coping at

the top of the south wall, extending from the west end of the building about thirty feet to the east, the gutter, and said foundation piers, at a point about fifteen feet below the surface, about five feet.

"That said projections above the surface of the ground were in process of construction during the summer, and until about October 1, 1913.

"That the *Hotel Wisconsin Realty Company* has from time to time permissively used said alley or passageway in washing the windows of its said hotel building and making ordinary repairs to various parts of the wall and to awnings over windows.

"That neither the Hotel Wisconsin Company nor the *Hotel Wisconsin Realty Company,* as owners or otherwise, used or occupied any portion of said ten-foot strip, alley or passageway in an open or hostile manner, or under such circumstances as to challenge the rights of the true owners of said lot 14, to their knowledge or to the knowledge of any of them, or so as to charge any of them with such knowledge. That said hotel companies did not know, nor did any one interested in any of the portions of said lots 10, 11, and 14 know, that any portion of said hotel building encroached upon any portion of lot 14 until shortly before the commencement of this action.

"That neither the Hotel Wisconsin Company nor the *Hotel Wisconsin Realty Company* have ever expended any money whatsoever in making improvements upon, nor have they in any way improved, lot 11 in reliance upon any claim of right to any estate whatsoever in the north ten feet of lot 14.

"That at all times since the completion of said hotel building said defendants *Thompson* and *Straus Building Corporation,* and the predecessors of the latter, as to the said respective portions of said ten-foot strip subject to said alley or passageway, have been in continuous possession, but that the said projections and encroachments interfere with the rights of said defendants *Thompson* and *Straus Building Corporation* in said premises and in and to said alley or passageway, and their beneficial use thereof."

Upon such findings the court decreed a removal of such encroachments above the surface of the alley, and further

ordered the removal of the substructure of the *Hotel Wisconsin Realty Company* in the alley, at any time when the *Building Corporation* shall have occasion to use that portion of the alley covered by such substructure.

It appears from the evidence that in the course of the construction of its building the *Building Corporation* for the first time discovered the encroachments underground of the *Realty Company* and that it utilized such substructure for the purpose of placing thereon its foundations. Having held that the easements were created by reservation and not by exception, it follows that Butler, the owner of the corner, and the *Thompsons* had the fee title to that portion of their premises included in the alley, subject only to the easement. The *Building Corporation,* under its lease, is in possession of the entire strip constituting the alley belonging to it, excepting where the lower post of the hotel slightly protrudes. Under such circumstances ejectment will not lie. *Rasch v. Noth,* 99 Wis. 285, 74 N. W. 820; *Huber v. Stark,* 124 Wis. 359, 102 N. W. 12. But the party aggrieved is entitled to an equitable remedy for his relief. *Rahn v. Milwaukee E. R. & L. Co.* 103 Wis. 467, 79 N. W. 747. Encroachments such as here complained of constitute a continuous trespass. *Beck v. Ashland C. & T. Co.* 146 Wis. 324, 130 N. W. 464; *St. Croix Timber Co. v. Joseph,* 142 Wis. 55, 124 N. W. 1049; *Rock Co. v. Weirick,* 143 Wis. 500, 128 N. W. 94.

On the 24th day of October, 1912, which was shortly after the execution of the ninety-nine-year lease, the various members of the Ogden family who were the owners of the property on which the Hotel Wisconsin was built subject to the lease, entered into an agreement with the Hotel Wisconsin Company, which agreement recited the creation of the easement in 1871 for the benefit of all the owners of lots 14 and 15. It then recited the making of the ninety-nine-year lease to the Hotel Company; the ownership of certain of the Ogdens of the east fifty feet of said lots 14 and 15;

and that they are entitled to the use of the alley and to have the same perpetually kept open; and that the keeping open of such alley perpetually is of material benefit to all of the parties; and the agreement then continues:

"Now, therefore, the said parties of the first part, in consideration of the making of the lease aforesaid, and to more effectually carry out the covenants therein contained, and for other good and valuable consideration, do hereby, for themselves, their heirs, executors, administrators, or assigns, covenant and agree to and with the said party of the second part, its successors and assigns, that the said alley or passageway ten (10) feet in width, across the north ten (10) feet. of the west two-thirds (⅔) of said lot fourteen (14) in block sixty (60), shall be perpetually kept open, and shall be and remain unobstructed, and that the said parties of the first part will never consent, either expressly or impliedly, to, or permit the closing of, said alley or the obstruction thereof, or to any interference therewith for any purpose or in any manner whatsoever, without the consent of the said party of the second part, its successors or assigns, the consent of the said party of the second part being hereby declared and agreed to be a condition precedent to consenting by said first parties, or any of them, to or permitting such closing, interference, or obstruction.

"It is further covenanted and agreed that this instrument shall be construed as a covenant running with the east fifty (50) feet of said lots fourteen (14) and fifteen (15), in said block sixty (60), and shall be binding upon the heirs, executors, administrators, and assigns of the said parties of the first part, according to their separate and several ownerships, as aforesaid.

"It is further understood and agreed that this instrument is not intended and shall not be construed as a waiver of any rights acquired in said alley by adverse user, or prescription, or otherwise."

Counsel for the *Realty Company,* under the agreement last referred to, known as the light-and-air agreement, contend that under the provisions of secs. 4210, 4211, and 4212 of the Statutes it held those portions of the alley occupied by it adversely; that it entered into possession under claim or

color of title, and that it continued its occupancy adversely for a period of over ten years. It must be borne in mind that the easement with respect to the alley was reserved for the owners of portions of lot 14, and that such easement was appurtenant to said lot and not to lot 11. The Ogdens in no way have asserted any prescriptive right or any right under color of title to any part of the alley or passageway as an appurtenance to lot 11. The court found "that said light-and-air agreement of October 24, 1912, . . . constitutes a mere personal covenant on the part of the first parties thereto, and does not amount to a claim that any alley or passageway was claimed to be appurtenant to lot 11, but is a mere statement that, as to that lot, light and air had theretofore been enjoyed." Furthermore, the Ogdens in said light-and-air agreement covenanted that "they at no time will expressly or impliedly consent to or permit the closing of said alley or the obstruction thereof." This light-and-air agreement does not purport to grant or convey anything. It is merely a recital with respect to the reservation of the easement as an appurtenance to lot 14, and a further covenant on the part of the Ogdens that they have done no act which would release their alley rights, and that in the future they would not release such rights. Under such circumstances the ten-year statute clearly does not apply. Besides, these encroachments were not upon the surface of the alley, but were either above the surface or beneath the surface, and, as found by the court, were not open and notorious, and were in no event for the full ten-year statutory period.

We now come to the relief awarded the *Building Corporation* and the *Thompsons* with respect to these encroachments of the *Realty Company*. It is clear that up to the present time, at least, the *Building Corporation* sustained no substantial damages by reason of the structures under the surface of the alley built by the *Realty Company*. On the contrary, it would appear that the *Building Corporation* has made substantial use of the foundations of the *Realty Com-*

*pany* constructed in the alley. The right of possession of the west 40.75 feet of lots 14 and 15 is in the *Building Corporation,* subject only to the alley easement. It has the right to occupy all of the alley under the surface. To decree a removal at this time of the substructure of the *Realty Company* would entail a great loss to the *Realty Company* and a possible danger to the support of its large hotel building. Such removal would also materially affect the *Building Corporation.* A court of equity, in its effort to do substantial justice between the parties, will not endeavor to commit a wrong, even to a wrongdoer. Under these circumstances, we are of the opinion that the disposition of that branch of the case which involves the substructure was in conformity with equity and should be affirmed.

The projections of the hotel above the surface of the alley, while they are invasions of the rights of those who are entitled to the full fruits of the easements, are not of a substantial nature, and do not materially interfere with the rights of the *Thompsons* and of the *Building Corporation* with respect to light and air. The building of these projections, to a large extent, enter into the architectural design of the hotel building. Their removal would largely destroy such design and would disharmonize the south exposure of the hotel with the rest of the building. This certainly would not be to the advantage of the *Building Corporation* or of the *Thompsons.* These projections above the surface are so slight that they were not even noticed while they were being constructed, by the *Thompsons* or the *Building Corporation.* This characterizes these obstructions as unsubstantial. The removal at this time of these projections above the surface would entail a large expense to the *Realty Company.* Neither the *Thompsons* nor the *Building Corporation* can lawfully construct a building upon this alley. Until the time arrives where by mutual consent of all the parties interested the alley rights are released, the owners of lot 14 cannot build upon or across this alley. We have therefore come to the

conclusion that it would be highly inequitable, under the facts and circumstances of this case, to affirm that portion of the judgment which requires the removal of the obstructions above the surface.

In all other respects we affirm the judgment of the learned circuit court.

*By the Court.*—The judgment of the lower court is modified in accordance with this opinion, and as so modified is affirmed.

A motion for a rehearing was denied, with $25 costs, on June 22, 1925.