GULBRANDSEN, Administrator, Appellant, vs. CHASEBURG STATE BANK and another, Respondents.

*November 8, 1940—January 7, 1941.*

For the appellant there were briefs by *Lees, Bunge & Fuller* of La Crosse, and oral argument by *Hubert V. Fuller.*

For the respondent Chaseburg State Bank there was a brief by *Elmer Mau* and *Hale & Skemp,* all of La Crosse, and oral argument by *Quincy H. Hale.*

For the respondent John Lowe there was a brief by *George H. Gordon, Law & Brody* of La Crosse, and oral argument by *Lawrence J. Brody.*

FRITZ, J. The plaintiff, as administrator of the estate of Emma Lietke, deceased, seeks to recover from the defendants, Chaseburg State Bank and John Lowe, the value of certain bonds, which belonged to the decedent, and which plaintiff alleged were wrongfully taken from her safety-deposit box at the defendant bank by its cashier, John Lowe, and converted or fraudulently obtained and retained by the bank and used as its own property until it finally sold them for cash and retained the proceeds. The defendants claim that on May 28,

1936, the bonds were loaned by the decedent to John Lowe personally for a period of thirty days to use as collateral in helping his brother Fred Lowe to maintain a sufficient credit balance in his checking account at the defendant bank; that to provide funds to meet checks issued by Fred Lowe against that account John Lowe took from Emma Lietke's safety-deposit box and delivered to the bank about $7,000 worth of the bonds on June 1st and an additional $5,000 worth on June 4, 1936; that after the expiration of the thirty-day period it was agreed between John Lowe and Emma Lietke that she would accept in exchange for the bonds John Lowe's promissory note for $1,400 and another note for $10,000 signed by John and Fred Lowe and some accommodation makers; that on November 4, 1936, she gave written instructions to the bank to deliver the bonds to John Lowe; that, in accordance with the instructions, the bonds were delivered to John Lowe by the bank; that it received in return $11,400; and that John Lowe sold the bonds for a sum in excess of $11,400 and turned this excess in cash over to the decedent. Plaintiff claims that at the time of the alleged transactions between the decedent and John Lowe, in relation to her agreeing to loan the bonds to him, her agreeing to accept two notes for sums aggregating $11,400 in exchange therefor, and her signing the written instructions directing the delivery of the bonds to him, she was mentally incompetent and incapable of comprehending the nature of such transactions.

Upon the trial only two questions were submitted by the court to the jury for a special verdict; viz., whether the deceased lacked sufficient mental capacity to know and understand the nature and effect (1) of an instrument signed by her on May 28, 1936, which purports to loan the bonds to John Lowe for thirty days; and (2) of an instrument signed by her on November 4, 1936, which purports to authorize and direct the bank to deliver the bonds to John Lowe, or order, and to release the bank from all liability on account of the delivery

of such bonds. The jury found in answer to these questions that the decedent was lacking in such mental capacity at each of the times in question. Notwithstanding these findings, the court granted the bank's motion, after verdict, for judgment dismissing the complaint against the bank; but instead of granting a similar motion by John Lowe for judgment in his favor, the court granted his motion in the alternative for a new trial. Upon the entry of judgment dismissing the complaint against the bank plaintiff appealed, and Lowe noticed a motion for the review of the court's ruling that denied his motion for judgment dismissing the complaint against him.

The plaintiff contends (I) that, in view of the facts established by the evidence or which can reasonably be inferred therefrom, the court erred in not submitting to the jury, as additional questions for its special verdict, the issues as to (1) whether there was a fiduciary and trust relationship existing between the cashier, John Lowe, of the defendant bank and Emma Lietke (a) on May 28, 1936, and also, (b) on November 4, 1936, and (2) whether the bank knew of the existence of such fiduciary relationship; and that the court was not justified in submitting to the jury only the questions as to whether the decedent was lacking in mental capacity; (II) that the court erred in not granting judgment for plaintiff against both defendants, as a matter of law, in view of the jury's findings that the decedent was mentally incompetent on May 28th and November 4, 1936, and likewise erred, in view of those findings and facts reasonably inferable under the evidence, in granting judgment dismissing the complaint against the bank; (III) and that the court erred in admitting over plaintiff's objections testimony given by John Lowe as to his conversations in his transactions with the deceased, and that no consideration or effect can be given to that testimony.

On the other hand, the defendants contend (I) that there was no credible evidence to support the jury's findings that decedent lacked sufficient mental capacity to understand the

nature of the transactions in question; (II) that the evidence warranted finding that there was no fraud, overreaching, or violation of any fiduciary relationship on the part of either of the defendants; (III) (1) that, even if the decedent was incompetent, as the jury found, that fact would not render the transactions in question void in view of the fact that the defendants could not be restored to their original position, and (2) that, in view of this latter situation, it does not follow, as plaintiff contends, that judgment should be for him, as a matter of law, because of the jury's finding that she was incompetent; and (IV) that Emma Lietke's estate, of which plaintiff is but the representative, and Henry Lietke, who is the son of Emma Lietke and the principal beneficiary under her will, are estopped to assert such mental incapacity on her part in order to avoid the agreements made by her with John Lowe.

For the consideration of such of the above contentions as we find it necessary to pass upon, in view of our conclusions on this appeal, it suffices to note the following additional matters. In so far as the jury's findings that the decedent was mentally incompetent are concerned, it is true, as the trial court rightly concluded, that the evidence upon which plaintiff relies to sustain these findings is "very weak." There is, however, some evidence which the jury could reasonably consider credible and sufficient to admit of its findings. Although it was not within the court's province, under these circumstances, to conclude that the decedent was mentally competent, it was clearly within its discretion to grant, as it did in the interests of justice, Lowe's motion for a new trial in so far as the issues in respect to the competency of the decedent may continue to be involved herein.

In relation to the other issues, the following facts were established by evidence, which was competent excepting as hereinafter stated. The bonds in question were acquired by Emma Lietke, as a legatee under her husband's will, of which

John Lowe was executor, and as such executor he continued to keep them in the same safety-deposit box in defendant bank. After the distribution of the bonds under the final decree in the administration of her husband's estate, Emma Lietke permitted the bonds to remain in that safety-deposit box, and the key thereto remained at the bank in John Lowe's control. On May 28, 1936, defendant's brother, Fred, who had a bank balance of $1,610 in his account at defendant bank, but expected trouble with his account at another bank and therefore desired assistance if his account in the defendant bank became involved, asked John Lowe for such assistance. That evening John Lowe went to Emma Lietke's farm residence and had a conversation with her in the presence of her son Henry Lietke. In relation to that conversation the court permitted Lowe to testify (over the plaintiff's objection on the ground that he was incompetent to testify as to his transactions with the deceased, Emma Lietke) as to what was said by him and the deceased about his wanting to borrow her bonds to help his brother Fred if it should become necessary, and about her then signing an instrument which reads as follows:

"Chaseburg, Wis. May 28th, 1936. I, Emma Lietke, hereby loan to J. W. Lowe my investment bonds for his use for a period of thirty days. Mrs. Emma Lietke."

On June 1, 1936, checks drawn by Fred Lowe and presented for payment at defendant bank would have overdrawn his account, and, in order to provide funds to meet them, John Lowe delivered and sold to the defendant bank about $7,000 worth of the decedent's bonds, which he took from her safety-deposit box. For these bonds the bank gave Fred Lowe a credit of $6,690 in his account, and thereupon entered these bonds in its bond account as part of its capital assets. On June 3, 1936, John Lowe explained to the bank's directors at a directors' meeting what he had done and the source of the bonds, and that he had additional bonds of Emma Lietke's

worth $5,000, which he could and would use in the same manner if necessary. When it became necessary, in order to keep the checking account of Fred Lowe from being overdrawn on June 4, 1936, John Lowe delivered those additional bonds to the defendant bank, and it likewise entered those bonds in its bond account as part of its assets and entered therefor an additional credit of $10,640 in Fred Lowe's checking account. Upon the discovery of these entries by an examiner for the state banking commission, it took exception to such use of Emma Lietke's bonds and directed the return thereof to her and the substitution of some other credit in Fred Lowe's account. When the condition of Fred Lowe's account at the other bank had not been improved toward the end of the thirty-day period of the loan of the bonds to John Lowe, he went again to Emma Lietke's residence and then and also at divers times thereafter, until in November, 1936, had conversations with her in the presence of her son, Henry, in relation to the bonds in question. On the trial, the plaintiff likewise objected to Lowe's testifying as to these conversations on the ground that he was incompetent to testify as to his transactions with the deceased, but, over plaintiff's objections, the court permitted him to testify as to his conversations with her in relation to his having to borrow the bonds for an additional period and securing her verbal consent to the continued loan thereof; and in relation to subsequently discussing with her and her son, Henry, their taking a promissory note in place of the bonds if Fred Lowe's account remained in difficulty indefinitely, their agreeing to take a six per cent note to cover the bonds, if the note was good bankable paper, and their subsequently agreeing to accept a note for $10,000 signed by Fred and John Lowe and several others, together with a note for $1,400 signed by John Lowe.

It also appears that under date of June 25, 1936, John Lowe prepared an interest-bearing note for $10,000 due in six months and payable to Emma Lietke, or order; and that this

note was signed by John Lowe and his brother, Fred, who subsequently had it signed also by four accommodation makers, and in November, 1936, brought the signed note to John Lowe. He was permitted to testify (over plaintiff's objection) that he took the $10,000 note to the deceased and told her, in the presence of Henry, who the signers were and their responsibility; and that the decedent and Henry agreed to take the note, together with another note for $1,400 signed by John Lowe, in exchange for the bonds.

In November, 1936, John Lowe notified the bank that he was in a position to take the bonds out of the bank and pay the then market value of $11,400 in cash. The bank consulted its attorney and directed him to see Emma Lietke and receive her instructions as to what should be done with the bonds. He testified that he went to her home and in the presence of her son explained that the bonds would be delivered to them if they preferred; that he would have taken them along that day but had decided not to run the risk because of the danger of carrying that amount in negotiable instruments; that Emma Lietke appeared to be perfectly sound mentally; that she and her son stated that they wished the bank to deliver the bonds direct to John Lowe; and that she and her son then signed the following instrument:

"Receipt and release. You are hereby directed and authorized to deliver to John W. Lowe, or order, the following described bonds, to wit: [list of bonds]. The Chaseburg State Bank is hereby released from all liability of whatsoever nature on account of the delivery of such bonds. Nov. 4, 1936. Emma Lietke, Henry Lietke."

On July 1, 1936, Charles Spalding succeeded John Lowe as cashier, and the latter became a salesman for Bartlett & Gordon, security brokers at La Crosse. Through them Lowe arranged for the sale of the bonds about November 17, 1936. Thereupon Spalding took the bonds from the bank to the brokers' office and delivered them there in exchange for their

draft for $11,450, and the defendant bank collected that amount on the draft. It never paid or gave any credit for the proceeds or value of the bonds to Emma Lietke, but after the delivery of the bonds at the brokers' office, Spalding wrote to her on November 18, 1936, as follows:

"According to your direction and authorization, we have delivered to J. W. Lowe the bonds loaned him by yourself and deposited in this bank as collateral security. These bonds were delivered November 17, 1936. Very truly yours, Chas. H. Spalding, Cashier."

John Lowe testified in relation to the proposed note for $1,400, and also the other note payable to Emma Lietke, as follows:

"November 17, 1936, the date of the note is approximately the date the note was made and it was put in Mrs. Lietke's safety-deposit box about that time. The $10,000 note was put in about the same time. I don't think it was put in before that date as nearly as I can remember. . . . The $1,400 note or it is in fact, $1,450, represents the difference between the amount I had sold the bonds to the bank for which was $11,450, the difference between that and the $10,000 note. . . . Mrs. Lietke had agreed to loan me the difference personally."

He also testified in relation to the $10,000 note, "I don't know that she ever saw the note." The notes were in her safety-deposit box when John Lowe turned them over to a guardian (and his attorney) appointed for Mrs. Lietke as an incompetent on July 10, 1938, shortly before she died on September 1, 1938. The plaintiff, Gulbrandsen, was appointed administrator on May 20, 1939, and he listed the $10,000 and $1,450 notes in the inventory filed by him on February 8, 1940, but he tendered the $10,000 note to the defendant bank and demanded payment of $11,400 before commencing this action.

Regardless of whether or not Emma Lietke had sufficient mental capacity to understand the nature and effect of the

instruments signed by her on May 28 and November 4, 1936, and whether or not the court rightly overruled plaintiff's objections to John Lowe's testimony in relation to his conversations with the deceased, and assuming that defendants' contentions in those respects could be sustained and also that a valid agreement was made in May, 1936, between the deceased and John Lowe for the loan of her bonds to him for thirty days for the purpose of using them as collateral security to raise funds to keep his brother's checking account from being overdrawn, there must be taken into consideration in deciding this case the force and effect of the following undisputed facts: John Lowe, instead of using the borrowed bonds merely as collateral security sold the bonds outright to the defendant bank and it, with knowledge that the bonds had been loaned to him by the deceased for but the purpose of using them as such collateral security, acquiesced in the sale by accepting the bonds and including them as property of which it had the absolute and unqualified ownership, by making entries therefor in its bond account and entering corresponding credits in Fred Lowe's checking account. These acts on the part of Lowe and the bank in relation to the bonds, which, upon being loaned to him by the deceased for the particular purpose of using them as collateral security, were under his control as but a "bailee for gratuitous use" (6 Am. Jur. p. 146, § 16; p. 152, § 25), and if pledged by him to the bank as collateral security would have been in its possession as but a bailee (6 Am. Jur. p. 184, § 55) with but the rights and duties in respect to the sale thereof of one holding securities as a pledgee (49 C. J. p. 948, § 98; 21 R. C. L. p. 671, § 33; *Dykers v. Allen*, 7 Hill, 497, 42 Am. Dec. 87), were clearly in disregard and violation of her rights as the owner and bailor of the bonds. Consequently Lowe's absolute and unconditional sale of the bonds to the bank and its acceptance and use thereof under such sale as its own property clearly constituted conversion, which

rendered him, as well as the bank, by reason of its participation in thus assuming unauthorized control and dominion of her bonds with knowledge of the limited right of Lowe as bailee, liable to the deceased for the damage which she sustained if she was thereby deprived permanently of her property. As the court said in *Boldewahn v. Schmidt,* 89 Wis. 444, 446, 62 N. W. 177:

"If a person who is intrusted with the goods of another for a particular purpose puts them into the hands of a third person, contrary to orders, it is a conversion. A wrongful intent is not essential. It is enough if the owner has been deprived of his property by the act of another assuming an unauthorized dominion and control over it."

To the same effect see *Hercules Powder Co. v. Rowan,* 245 Ill. App. 291; *Wheeler v. Pereles,* 40 Wis. 424; *Meyer v. Doherty,* 133 Wis. 398, 113 N. W. 671, 13 L. R. A. (N. S.) 247, 126 Am. St. Rep. 967; *Regas v. Helios,* 176 Wis. 56, 186 N. W. 165; *Mullen v. J. J. Quinlan & Co.* 195 N. Y. 109, 87 N. E. 1078, 24 L. R. A. (N. S.) 511. Consequently, plaintiff is entitled to recover judgment herein against both defendants for their conversion of the bonds in June, 1936, unless the unauthorized use thereof did not result in depriving her thereof permanently, because of subsequent transactions between her and the defendants by reason of which they claim she effectively disposed of her interest in the bonds, or, otherwise, became deprived of her right to recover the value thereof from the defendants.

In these respects the defendants claim (1) that in the course of conversations between John Lowe and the deceased during the months of June to November, 1936, he discussed with her and her son the acceptance by her of a promissory note in place of the bonds and that she agreed to exchange them for a promissory note for $1,400 to be signed by John Lowe and a note for $10,000 to be signed by him and his brother, Fred, and also some accommodation makers; and

(2) that by reason of the instrument which she signed on November 4, 1936, and which purports to direct and authorize the delivery of the bonds to John Lowe and to release the bank from all liability on account of such delivery, and by reason of the subsequent delivery of the bonds in accordance therewith, the plaintiff is not entitled to recover from the defendants on the theory that they are liable for the wrongful conversion of the bonds. In passing upon these claims, it must be noted that the only basis in the evidence in respect to the first of these claims is the testimony of John Lowe as to what he claims was said in the conversations in question. When the bank's attorney first questioned Lowe on the trial as to whether he had discussed with the deceased the retention of the bonds beyond the thirty-day period and also what the conversation was, plaintiff duly objected to the competency of the witness to testify as to a conversation with the deceased. Thereupon the bank's attorney stated that the door had been opened by plaintiff's counsel asking the witness if the bonds were returned to Emma Lietke before August 8, 1936, and upon that ground the court overruled the plaintiff's objection to Lowe's testimony, and thereafter permitted the witness to testify at length, notwithstanding the plaintiff's objections, in answer to questions asked by the attorneys for Lowe, as well as the bank, in relation to the conversations between him and the deceased. On this appeal the defendants do not attempt to sustain the court's ruling admitting the testimony on the ground that the door had been opened by a prior question put to Lowe by plaintiff's counsel, and there does not seem to be any basis in the record for that ground. But defendants now contend, in seeking to justify the admission of the testimony in question, that sec. 325.16, Stats., which bars such testimony in relation to conversations with a deceased, does not apply when the conversation was in the presence of a third person who,—as Henry Lietke in the case at bar,—is in fact the opposite party in the action and is

himself in a position to take the stand and testify as to the the conversation. The contention cannot be sustained. There is no such exception by virtue of any provision in sec. 325.16, Stats. The only case construing that statute, which is cited by defendants, is *Lowry v. Lowry,* 211 Wis. 385, 247 N. W. 323, 248 N. W. 472. That case is, however, not in point. The witness whose competency to testify was under consideration was an agent of the deceased and not, as in the case at bar, himself a party to the action whose interest therein was adverse to that of the deceased. On the other hand, that testimony which is otherwise incompetent and barred under sec. 325.16, Stats., is not rendered competent by reason of the fact that the transaction in question occurred in the presence of other persons who are mere intermediaries has been held in *Brader v. Brader,* 110 Wis. 423, 85 N. W. 681; *Morgan v. Henry,* 115 Wis. 27, 90 N. W. 1012; and in *Anderson v. Laugen,* 122 Wis. 57, 61, 99 N. W. 437, the testimony of a witness, which was otherwise incompetent under sec. 325.16, Stats., was held to continue to be inadmissible even though the witness' transaction with the deceased took place in the presence of other persons who had an interest in the litigation. Consequently, in the absence of some provision in sec. 325.16, Stats., rendering testimony, which is otherwise incompetent thereunder, admissible because the transaction was in the presence of a third person who had an interest in the cause of action and is available and able to take the stand as a witness, the testimony given by Lowe as to his conversations with Emma Lietke was incompetent and should have been excluded upon plaintiff's objection.

It follows that unless competent testimony is available to establish that the deceased entered into a valid contract with Lowe to accept the proposed notes for $10,000 and $1,400 in exchange for her bonds, there is no basis for holding that the evidence establishes any transaction in that respect by

reason of which she or her estate can be deemed to have become deprived of her right to recover the value of the bonds from the defendants.

Even if it is assumed that Emma Lietke was mentally competent to understand the nature and effect of the instrument which she signed on November 4, 1936, the provisions therein directing and authorizing the delivery of the bonds to John Lowe, or order, and releasing the bank "from all liability of whatsoever nature on account of the delivery of such bonds" afford no basis or justification for the bank's acceptance as its own property of the draft for $11,450 which was given to its cashier at the office of Bartlett & Gordon in exchange for the bonds upon his delivery thereof at that office on November 17, 1936, and the bank's retention of the proceeds collected by it on that draft. In the instrument of November 4, 1936, there is no direction or authorization to John Lowe, or order, to dispose of the bonds or do anything in relation to them otherwise than to accept the delivery thereof which, of course, follows by implication from the direction to the bank to make such a delivery. Consequently, upon receiving such delivery Lowe would have been but a bailee of the bonds without any ownership therein on his part or authority to make a sale or similar disposition thereof in the absence of some valid agreement or authorization to that effect by Emma Lietke. Likewise there is in the instrument of November 4, 1936, no express or implied authorization or basis for the acceptance or retention by the bank of the proceeds derived from a sale of bonds whether made personally or indirectly by either Lowe or the bank; and there is no other proof as to any such authorization or basis in any other form. On the other hand, the provision in relation to releasing the bank, which is likewise in the instrument directing the delivery of the bonds to Lowe, or order, is but a release from all liability "on account of the delivery of such bonds." That cannot be considered an intended release of

the bank from its liability by reason of the retention of the proceeds in the event of an unauthorized sale of the bonds subsequent to a delivery thereof directed in the instrument.

It follows likewise, under the rule applied in the cases cited above, that the unauthorized sale thereof on November 17, 1936, whether made by either Lowe or the bank, directly or indirectly, and the latter's collection and retention of $11,400 of the proceeds thereof, likewise constituted the conversion thereof by the defendants, and that by reason thereof they can be held to have become liable to her for such damage as she sustained thereby.

Neither her right thereto nor the right of the plaintiff to recover therefor as the representative of her estate can be considered impaired by reason of any theory as to an estoppel operative against her or the plaintiff or Henry Lietke, as the principal beneficiary under her will. It does not appear that either the decedent or Henry Lietke had any knowledge or notice of the acts on the part of the defendants which constituted the conversion of the bonds, as stated above, or by which defendants claim there was affected an exchange of the bonds for the notes for $10,000 or $1,400. Although the bank's cashier stated in the letter which he wrote to her on November 18, 1936, the day after the sale, "According to your direction and authorization, we have delivered to J. W. Lowe the bonds loaned him by yourself and deposited in this bank as collateral security. These bonds were delivered November 17, 1936," it does not appear that either she or Henry Lietke were informed then or at any other time that her bonds had been sold by John Lowe or the bank. Likewise, although John Lowe testified that he put the $10,000 and $1,400 notes in Emma Lietke's safety-deposit box about November 17, 1936, and also that he deposited the difference between the amount realized on the sale of the bonds on November 17, 1936, and the aggregate amount of those notes to the credit of Emma Lietke's account at the bank, and like-

wise so deposited the amount of the first semiannual interest accrual on the $10,000, there is no proof that either she or Henry Lietke were informed as to any such transactions, or had any knowledge as to the placing of the notes in the safety-deposit box until the contents thereof were turned over by John Lowe to the guardian appointed for her.

It follows that the court erred in granting the bank's motion for judgment notwithstanding the verdict, and that the judgment dismissing the complaint against that bank must be reversed. In connection with such reversal, plaintiff would be entitled to judgment against defendants in the absence of competent proof in the record to establish that a valid contract was made between John Lowe and the deceased by which she agreed to accept the notes for $10,000 and $1,400 in exchange for her bonds and he was to become entitled to the absolute ownership thereof upon his performance of the contract; but inasmuch as it does not appear definitely that no competent proof to establish the making of such a contract will be available upon a retrial, it is deemed proper in the interests of justice to direct that a new trial be also granted in respect to the bank. The court's order granting a new trial as to Lowe must be affirmed.

*By the Court.*—The judgment dismissing the complaint against the defendant Chaseburg State Bank is reversed, with directions to enter an order granting a new trial. On the defendant John Lowe's motion for a review, the order denying his motion for judgment is affirmed.