**In the Matter of Joseph B. ADAMETZ a/k/a Joseph Bruce Adametz, Joe Adametz, Debtor.**

**William MUMM and Mercedes Mumm, Plaintiffs,**

**v.**

**Joseph ADAMETZ, Defendant.**

**Adv. No. 83–0260–7.**

United States Bankruptcy Court, W.D. Wisconsin.

Sept. 19, 1985.

David Krekeler, Collins, Beatty & Krekeler, Madison, Wis., for plaintiffs.

Roy L. Prange, Jr., Ross & Stevens, S.C., Madison, Wis., for defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

This action was brought to determine the dischargeability of a debt due from debtor to the plaintiffs ("Mumms") for the sale by debtor of a New Idea Uni-System purportedly owned by the Mumms. The Mumms allege that the sale constituted a conversion and the debt is therefore nondischargeable pursuant to 11 U.S.C. § 523(a)(6) as a willful and malicious injury to property, and is also nondischargeable under 11 U.S.C. § 523(a)(4), as an act of embezzlement. The Mumms also argue that a constructive trust and an equitable lien in their favor should be applied to the sale proceeds.

The Mumms own two farms, the "Mumm's farm" on which they live, and the "Fennimore farm." In March or April, 1980, William Mumm and the debtor ("Adametz") entered into an agreement whereby they would commence a farming operation upon the Fennimore farm in a farm-share arrangement. Adametz was to furnish the machinery and Mumm and Adametz were to buy the feed and cattle "50/50." The "livestock-share farm lease agreement" dated March 26, 1981, provided that Adametz and Mumm owned the milk cows "50/50," and delineated which expenses Adametz and Mumm were individually liable for. "Partnership" settlements were made on a regular basis, approximately once a month. Adametz and Mumm would discuss who had paid for various expenses and "settle up" with each other.

On October 10, 1980, Mumm purchased a New Idea Uni-System ("Uni-System") for the sum of $15,600.00 from Murn Tire & Tool Company with proceeds of a Production Credit Association of Lancaster ("PCA") loan. The bill of sale was made out to William Mumm. Adametz accompanied Mumm while he shopped for the system and made the purchase. At the time the Uni-System was acquired it became

subject to a lien in favor of PCA pursuant to a preexisting security agreement and financing statement executed by the Mumms. For a period of approximately two months the Mumms used the Uni-System at the Mumm farm and paid for all repairs necessary to the equipment.

In late November or early December, 1980, the Uni-System was moved to the Fennimore farm for use in the farm-share arrangement. Mumm and Adametz agreed that Adametz was to keep up repairs on the Uni-System and pay interest equal to the interest the Mumms owed to PCA. Approximately every six months Mumm and Adametz would "settle up" for the interest payments.

In July, 1982, Adametz traded in the Uni-System to E.G. Briel & Sons, Inc. as a $9,500.00 down payment for the purchase of a John Deere Model 3940 Forage Harvester ("J.D. Harvester"). He borrowed $4,354.00 from John Deere Company ("John Deere Co.") for the balance of the purchase price. Adametz informed Mumm of the trade when Mumm called him sometime after it occurred, and explained that he traded in the Uni-System because he was having trouble with it. Mumm told Adametz he did not approve of the trade, but agreed to call the debt off it Adametz put the J.D. Harvester in Mumm's name.

A farm sale terminated the farm-share arrangement between Adametz and Mumm on March 25, 1983. On July 28, 1983, Adametz filed for bankruptcy under chapter 7 and claimed the J.D. Harvester as exempt property. By that time PCA had assigned its security interest in the Uni-System to the Mumms because PCA did not intend to pursue the collateral.

### 1. *Dischargeability.*

The Mumms contend that the debt owing from Adametz to them arose from his conversion of the Uni-System, and is therefore nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Under Wisconsin law, " '[c]onversion is often defined as the wrongful exercise of dominion or control over a chattel.' Conversion may result from a wrongful taking or a wrongful refusal to surrender property originally lawfully obtained." *Production Credit Ass'n of Madison v. Nowatzski,* 90 Wis.2d 344, 353–54, 280 N.W.2d 118, 123 (1979) (citations omitted).[1]

Adametz asserts that he had authority to sell the Uni-System because he owned it either by virtue of having purchased it by agreement on October 10, 1980, with funds supplied by Mumm until he received a loan which had been extended by the Farmers Home Administration ("FmHA"), or by purchase directly from Mumm.[2] As evidence of the purported sale, Adametz entered exhibits showing that he insured the Uni-System and took depreciation tax credits as the owner of the Uni-System on his 1980 and 1981 federal income tax returns. Adametz submitted FmHA security agreements dated April 6, 1981 and April 6, 1982 and an Agrifax Financial Statement dated August 24, 1981 showing he listed the Uni-System as his property on each. Adametz also introduced receipts showing that he expended substantial sums for maintenance of the Uni-System, including installation of a new motor for $1,223.40. Mumm introduced a FmHA Farm & Home Plan

---

1. The Mumms contend that it is crucial to show that Adametz did not own the Uni-System in order to show he committed conversion. This court has held otherwise. *See In re Ries,* 22 B.R. 343 (Bankr. W.D.Wis.1982).

2. WIS.STAT. § 402.201(1) requires, "[e]xcept as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought...." Sub-

section (3)(c) excepts transactions in which payment has been made and accepted. *See Gerner v. Vasby,* 75 Wis.2d 660, 250 N.W.2d 319 (1977) (receipt and acceptance of goods consistent with an oral contract is part performance sufficient to take the oral contract out of the statute of frauds). In the instant case, if an oral contract for sale of the Uni-System existed, the delivery and subsequent acceptance of the Uni-System would work to take the contract out of WIS. STAT. § 402.201, thus making it enforceable even though it is not in writing.

dated February 9, 1982 on which Adametz listed the Uni-System as his property.

Mumm contends that he gave Adametz an option to purchase the Uni-System for its original purchase price with proceeds from the FmHA loan. Mumm introduced exhibits into evidence refuting the purported sale including receipts for repairs he made on the Uni-System and the supporting schedule for his PCA security agreement dated October 24, 1980 which includes the Uni-System. Mumm also introduced his 1980 and 1981 federal income tax returns showing that he too took depreciation tax credits as the owner of the Uni-System, and Agrifax Financial statements listing the Uni-System for 1981 through 1983.

WIS.STAT. § 402.106(6) provides, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." WIS. STAT. § 402.401(2) states,

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place ....

To determine whether a transaction constitutes a sale under these statutes, a court looks to the intent of the parties as indicated by the surrounding circumstances. *In re Wood*, 47 B.R. 774 (Bankr.W.D.Wis. 1985), citing *Consolidated Disc. Corp. v. Holton S.S. Bank*, 247 Wis. 152, 19 N.W.2d 171 (1945); *Barr v. Granahan*, 255 Wis. 192, 38 N.W.2d 705 (1949); *Smith v. Pfluger*, 126 Wis. 253, 105 N.W. 476 (1905). *See also City of Everett v. Sumstad's Estate*, 95 Wash.2d 853, 855, 631 P.2d 366, 367 (1981) ("A sale is a consensual transaction. The subject matter which passes is to be determined by the intent of the parties as revealed by the terms of the agreement in light of the surrounding circumstances."); *American Container Corp. v. Hanley Trucking Corp.*, 111 N.J. Super. 322, 328, 268 A.2d 313, 316 (1970) (A sale is a contract between two parties called the seller and the buyer, by which the former

in consideration of payment transfers to the latter the title and possession of property; it constitutes transfer of goods for consideration.). Under Wisconsin law a contract to sell implied in fact may arise from an express agreement or from an agreement as evidenced by circumstances which show a mutual intent to contract. *In re Estate of Stromsted*, 99 Wis.2d 136, 139 n.1, 299 N.W.2d 226, 228 (1980).

■ While Adametz has presented evidence showing that he intended to buy the Uni-System and that Mumm intended to sell it to him at sometime, the circumstances surrounding the transactions between Adametz and Mumm do not indicate that a sale did in fact occur. Mumm and Adametz testified that about September, 1980, they agreed that Adametz would buy certain cows and equipment, including the Uni-System. Mumm purchased Adametz's half of the dairy cows and equipment including the Uni-System, while accompanied by Adametz. In an entry in Adametz's FmHA Running Case Record dated October 1, 1980, the lender noted in regards to the farm-share agreement, "Joe has been leasing the cattle and machinery from 1/1 until his loan comes thru." When Adametz received the FmHA loan he used the proceeds to pay for the cattle and machinery and did not have enough monies to purchase the Uni-System. It seems clear that Mumm did not intend for the titles to the cows and equipment, including the Uni-System, to pass until and unless Adametz paid Mumm their purchase prices. Mumm testified that he left the option to purchase the Uni-System open, and reduced the price to $14,600, allowing Adametz credit for chopping wood on the Mumm's farm. Adametz presented no evidence that he ever paid Mumm, and insufficient evidence that title passed when the Uni-System was delivered to the Fennimore farm.

The evidence leads to the conclusion that the Uni-System was moved to the Fennimore farm to be used for the farm-share arrangement, although it was not referred to in the subsequent agreement dated

March 26, 1981,[3] and that the relationship between Adametz and Mumm was that of bailor-bailee.[4] "A bailment arises when the possession of a chattel is temporarily transferred but the general title remains in the hands of the original owner. Implicit in the bailment relationship is that the general titleholder be out of possession of the chattel and the bailee be in a position to exercise all possessory rights." *Moore v. Relish*, 53 Wis.2d 634, 639, 193 N.W.2d 691, 693 (1972). *See also Burns v. State*, 145 Wis. 373, 128 N.W. 987 (1910).

■ As bailee, Adametz did not have the right to trade in the Uni-System for the John Deere without Mumm's consent. *Gulbrandsen v. Chaseburg State Bank*, 236 Wis. 391, 295 N.W. 729 (1941). If a bailee puts the entrusted property into the hands of a third person contrary to orders, it is a conversion, and a wrongful intent is not essential, it being sufficient if the bailor has been deprived of his property by the act of another assuming an unauthorized control over it. *Gulbrandsen*, 236 Wis. at 402. The court in *Nowatzski, supra*, set forth an additional requirement for conversion: "[w]here, however, there is no wrongful taking and the defendant rightfully comes into possession of the chattels, a demand by the rightful owner and a refusal by the alleged tortfeasor are necessary elements of the tort." 90 Wis.2d at 354, 280 N.W.2d at 123 (citation omitted). Mumm testified that upon hearing that Adametz sold the Uni-System, he told Adametz that he disagreed with the sale, and wished to have the John Deere turned over to him, which Adametz agreed to but failed to do. Absent any countervailing evidence from Adametz, this appears to satisfy the "demand-refusal" requirement set out in *Nowatzski*. Therefore, Adam-

etz's sale of the Uni-System constitutes conversion.

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." In *In re Donny*, 19 B.R. 354 (Bankr. W.D. Wis.1982), this court explained that under section 523(a)(6), "injury" is a broad category intended to include common law conversion where the conversion is willful and malicious.

> Not every conversion is willful and malicious. A conversion may be no more than innocent and technical. 'There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.' *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).

19 B.R. at 357–358. In *Donny*, the debtor, an employee of the plaintiff, sold some of plaintiff's cattle and retained the proceeds. The court held that the transaction constituted a willful and malicious conversion;

> Donny knew to whom the property in question belonged, and although there is no reason to doubt his intention to restore the funds at some future date, he knew and intended that Danekas would suffer the loss or risk of loss through his exercise of dominion over the sale proceeds. Willful and malicious in this context does not require that the debtor be motivated by personal hatred, spite or ill will in harming the victim. *It is sufficient that the debtor know that an injury will be caused and proceed in the face of this knowledge to carry out the actions which will cause the injury.*

---

**3.** Article D(3) of the Agreement provides that all expenses, including investments in personal property, incurred for machinery and equipment be furnished by the tenant. Since the Uni-System was purchased *prior* to the agreement it is not dealt with by this section.

**4.** It could also be argued that the Uni-System was partnership property because it was used

for Adametz's and Mumm's mutual benefit. But the Uniform Partnership Act, Chapter 178, WIS. STAT. is not applicable to the instant case because the livestock-share farm lease dated March 26, 1981, provides, "[t]his lease shall not be deemed to give rise to a partnership relation . . . ."

19 B.R. at 359 (emphasis added) (footnote omitted).

■ Both Adametz and Mumm testified that Adametz thought he owned the Uni-System at the time he traded it in. Adametz contends that therefore, his action cannot be deemed to be a willful and malicious conversion. This would not necessarily be the case even if Adametz actually did own the Uni-System. In *In re Ries*, 22 B.R. 343 (Bankr.W.D.Wis.1982), the debtors owned a piano which was subject to a security interest. They sold the piano without notice to the secured party and without the secured party's consent and retained the proceeds. This court held first that the sale of the secured property without the secured party's consent constituted conversion, citing *In re Duranti*, 1 B.R. 54 (Bankr.W.D.Wis. 1979). *See also In re Ellefson*, 54 B.R. 16 (Bankr.W.D.Wis.1985); *In re Kaiser*, No. 81–1043 (Bankr. E.D. Wis. April 22, 1982) (unauthorized sale of property subject to a security interest constitutes a technical conversion, citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re McGinnis*, 586 F.2d 162 (10th Cir.1978) and *Duranti, supra* ). This court then determined that the conversion was willful and malicious, explaining,

> under the *Donny* standard, all that is required is that the Rieses knew that in selling the piano, they would be harming WFC. It appears that there must actually be knowledge; a finding that the debtors should have known that harm would result will not suffice. As the court in *In Re Lewis*, 17 B.R. 46, 48 (Bkrtcy.W.D. Ark.1981) explained:
> '[W]hen a defendant has disposed of collateral without permission but with some notion, however erroneous it would appear to be, that he has a right to dispose of it, there can be no finding of willful and malicious conversion.'
> The debtor's knowledge can be inferred, of course, from his experience in busi-

ness, his concealment of the sale, or his admission that he read the security agreement which forebade the sale of the collateral.

22 B.R. at 347. This court recognized that the debtors were not in business, but held that because consumer transactions are relatively common in modern life, the debtors were presumed to be aware that the sale of the collateral would harm the secured party.

While Adametz was obviously not "motivated by personal spite or ill will" and may have had a valid reason for trading in the Uni-System, the evidence shows that Adametz realized that by taking the action the Mumms would be adversely affected as regarded PCA. Several facts lead to the conclusion that Adametz was aware of PCA's lien on the Uni-System. Adametz testified that he knew that the Uni-System was bought with loan monies from PCA and his FmHA documents dated February 18, 1983 and March 22, 1983, list the lien in favor of the PCA against the equipment. Mumm and Adametz engaged in periodic settlements wherein Adametz would pay Mumm the interest due on the Uni-System to PCA. The co-supplier of the FmHA loan, Jay Hanke, testified that Adametz was aware of the PCA's lien on the Uni-System sometime after the Uni-System was purchased, although he thought that Adametz believed he owned it.

A debtor's knowledge that a transfer of property subject to a security interest would harm a creditor can be inferred from the debtor's experience in business, *Ries*, 22 B.R. at 347. *See also In re Haynes*, 54 B.R. 20 (Bankr.W.D.Wis.1985) ("A debtor who enters into a security agreement is presumed to know that a sale of secured property would harm the secured creditor.")[5] Adametz testified that having received several secured loans through the FmHA he was experienced with farm financing. It can be deduced from this experience that Adametz

---

**5.** While both of these cases involved debtors who themselves had entered into security agreements with creditors, they are applicable to the instant case. The Mumms took out the pro-

ceeds to buy the Uni-System bearing in mind that Adametz would buy it from them with other loan proceeds.

realized that by trading in the encumbered Uni-System he was adversely affecting PCA. It can be further deduced that Adametz realized that he was obviously affecting the Mumms because they were liable for the loan. By trading in the Uni-System Adametz was putting it beyond the reach of both PCA and the Mumms. Adametz's initial acquiescence to Mumm's request to put the J.D. Harvester in Mumm's name further supports the conclusion that he was aware that his sale of the Uni-System would adversly affect the Mumms.

Since Adametz's debt to the Mumms arose from a willful and malicious conversion it is nondischargeable under section 523(a)(6). Having made this determination it is unnecessary to further determine whether 11 U.S.C. § 523(a)(4) is applicable to the facts before me.

2. *Amount of debt.*

■ "The general rule in Wisconsin is that, in an action for conversion, the wronged party may recover as damages the value of the property at the time of the conversion plus interest to the date of trial." *Nowatzski,* 90 Wis.2d at 354, 280 N.W.2d at 123 (citations omitted). *See also Ries supra; In re Pommerer,* 10 B.R. 935, 941, 4 C.B.C.2d 766 (Bankr.D.Minn.1981) ("The liability arising from this conversion is measured by the fair and reasonable market value of the property converted.").[6]

Adametz received $9,500.00 for the Uni-System when he traded it in. David Briel, of E.G. Briel & Sons, Inc., testified that the Uni-System was worth about $5,000.00 when it was traded in. He also testified that the Uni-System cost $700.00 to recondition and was sold at auction, which was sparsely attended, for $7,250.00. Mumm testified from his own experience of buying

and selling farm machinery, that he thought the value of the Uni-System was approximately $10,000.00, although he admits that he did not know the condition of the Uni-System at the time of the trade in.

Recognizing that the fair market value of trade-in vehicles may differ from their sale price because trade-in allowances are often inflated or deflated in relation to the actual value, *Holt v. Ellsworth Farmers Union Co-op,* 118 Wis.2d 335, 347 N.W.2d 612 (Wis.App.1984), in the absence of more compelling evidence I find that the fair market value of the Uni-System at the time of conversion was $7,250.00.

3. *Application of constructive trust and equitable lien doctrines.*

■ The Mumms ask this court to apply a constructive trust or an equitable lien to the Uni-System and its proceeds. Constructive trusts and equitable liens are devices fashioned by courts of equity to redress unjust enrichment.[7] To invoke a constructive trust unjust enrichment and some additional factor such as actual or constructive fraud, duress, abuse of a confidential relationship, mistake, commission of a wrong or some form of unconscionable conduct must be found. *Wilharms v. Wilharms,* 93 Wis.2d 671, 679, 287 N.W.2d 779, 783 (1980); *Prince v. Bryant,* 87 Wis.2d 662, 275 N.W.2d 676 (1979); *Gorski v. Gorski,* 82 Wis.2d 248, 262 N.W.2d 120 (1978); *Meyer v. Ludwig,* 65 Wis.2d 280, 222 N.W.2d 679 (1974). Wisconsin courts have added a third element; a constructive trust may only be applied to a specific *res* to which the party has acquired legal title. *In re Raschke,* 84–C–635–C (W.D.Wis. May 15, 1985); *Hanson v. Valdivia,* 51

---

**6.** If this court had found that a sale had taken place, and that the Mumms were only creditors of Adametz a different valuation would be appropriate. *See In re Ricketts,* 16 B.R. 833, 835 (Bankr.N.D.Ga.1982) ("The debt created by Ricketts' wilful and malicious injury here is that the bank is no longer secured in the amount of the value of this collateral. There is no way to value this loss of security, as debtor has placed it beyond the reach of the bank.... Therefore

we find that the entire balance of the debt owing to Trust Company is nondischargeable.").

**7.** "The constructive trust is an equitable device created by law to prevent unjust enrichment, which arises when one party receives a benefit, the retention of which is unjust to another." *Wilharms v. Wilharms,* 93 Wis.2d 671, 678, 287 N.W.2d 779 (1980).

Wis.2d 466, 476, 187 N.W.2d 151, 156 (1971).[8]

While Adametz's conversion of the Uni-System constituted a wrong by which he was unjustly enriched, the Mumms have failed to identify a specific *res* to which a constructive trust can be equitably applied. The general rule is that where property of another has been wrongfully used to acquire other property a constructive trust can be declared against the proceeds or the original property, so long as the property can be identified and does not come into the hands of a bona fide purchaser for value and in good faith. 76 Am.Jur.2d *Trusts* § 249, 470–471 (1970).[9] Adametz traded in the Uni-System on the J.D. Harvester. The Uni-System was subsequently sold at auction to an unidentified third party. The Uni-System cannot be subjected to a constructive trust because the Mumms presented no evidence that the buyer was not a bona fide purchaser for value. It can be reasonably assumed that the proceeds E.G. Briel & Sons received from the sale of the Uni-System on July, 1982 have been comingled to such an extent since that time that they cannot be sufficiently identified to be subject to a constructive trust.

If a constructive trust were to be imposed upon the J.D. Harvester as proceeds of the Uni-System in the hands of Adametz, the Mumm's equitable interest in it would be excluded from property of the bankruptcy estate,[10] 11 U.S.C. § 541(d), and would become property held in trust for the benefit of the Mumms. The Mumms could then demand that the J.D. Harvester be sold and satisfy their debt from the proceeds.[11] The value of the J.D. Harvester at this time is uncertain, but at the time Adametz acquired it it was worth approximately $14,496.30. Were the Mumms granted a con-structive trust on the J.D. Harvester Adametz would be deemed to have acquired only bald title at the time of purchase and the John Deere Co.'s purchase money security interest if enforceable at all would be subordinated to the Mumms equitable interest. Since an equitable remedy should not be applied if it harms the rights of third parties, *Leo Feist, Inc. v. Young*, 138 F.2d 972 (7th Cir.1943); *In re Bratt*, 257 Wis. 447, 43 N.W.2d 817 (1950); *Ogden v. Straus Bldg. Corp.*, 187 Wis. 232, 202 N.W. 34 (1925), a constructive trust may not be imposed upon the J.D. Harvester if it would extinguish an enforceable purchase money lien in favor of John Deere Co.

"Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises." *McIntyre v. Cox*, 68 Wis.2d 597, 601, 229 N.W.2d 613 (1975) citing Restatement, *Restitution*, § 161, at 650. Equitable liens differ from constructive trusts in that a constructive trust gives the plaintiff title to the property while an equitable lien gives the plaintiff a security interest in property. *In re Raschke, supra,* citing *In re Bailey*, 20 B.R. 906, 910–11 (Bankr. W.D.Wis.1982). The essential elements of an equitable lien are 1.) a benefit conferred upon the defendant by the plaintiff, 2.) an appreciation or knowledge by the defendant of the benefit, 3.) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit, and 4.) a specific *res* to which the lien can attach which can be identified or described with reasonable cer-

---

**8.** *See also In re Telemark Management Company, Inc.,* 54 B.R. 29 (Bankr.W.D.Wis.1985) (It is necessary to identify trust funds in order to follow and enforce the trust against the same, otherwise the beneficiary has only the right of a general creditor.).

**9.** *See also Richards v. Richards,* 58 Wis.2d 290, 298, 206 N.W.2d 134 (1973) ("Where a person holding property transfers it to another in violation of his duty to a third person, the third person can reach the property in the hands of the transferee ... unless the transferee is a bona fide purchaser.") (citing 5 Scott, *Trusts* § 470, 3444 (3d ed.) ).

**10.** Adametz has already exempted the J.D. Harvester from the bankruptcy estate under 11 U.S.C. § 522(d)(1), (5) and (6).

**11.** The Mumms have requested possession of the Uni-System.

tainty. *See: Puttkammer v. Minth,* 83 Wis.2d 686, 689, 266 N.W.2d 361 (1978); *McIntyre v. Cox, supra,* 68 Wis.2d at 602 (citation omitted).

There is a nondischargeable debt owing from Adametz to the Mumms. While the Uni-System is out-of-reach, an equitable lien may be impressed upon its proceeds, the J.D. Harvester. "If a court of equity can trace ... property unlawfully appropriated and transformed into another shape, it will intervene to secure it for the owner by creating an equitable lien thereon." 51 Am.Jur.2d *Liens* § 31, at 170 (1970).

 Unlike the constructive trust, the imposition of an equitable lien does not take the encumbered property out of the bankruptcy estate. Rather, "[i]t is merely a charge on property for the purpose of security, and is ancillary to and separate from the debt itself." 51 Am.Jur.2d *Liens* § 22, at 160–161 (1970). The imposition of an equitable lien would not permit the Mumms to defeat John Deere Co.'s priority, if one exists, in the J.D. Harvester. An equitable lien relates back to the time it was created by the conduct of the parties. 51 Am.Jur.2d *Liens* § 22, at 161 (1970). An equitable lien in the instant case would relate back to the time Adametz exercised wrongful control over the Uni-System, the date of trade-in.

John Deere Co.'s lien on the John Deere arose on the date of trade-in also. Its lien, however, is in the nature of a purchase money security interest which is given priority over conflicting security interests under WIS. STAT. § 409.312(4). That section provides, "A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter." Therefore, an equitable remedy may be imposed on the proceeds of the Uni-System, the J.D. Harvester, which does not preempt any purchase money security rights which John Deere Co. may have. *See Leo Feist et seq., supra.*

Upon the following it is hereby

ORDERED that judgment be, and hereby is, entered in favor of the plaintiffs, William and Mercedes Mumm, and against the defendant, Joseph Adametz, in the amount of seven thousand two hundred-fifty and no/100 ($7,250.00) dollars together with interest at the rate of 12% per annum from July 15, 1982, until judgment is entered.

IT IS FURTHER ORDERED that said judgment so entered in favor of the plaintiffs and against the defendant be and hereby is declared nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

IT IS FURTHER ORDERED that the plaintiffs be, and hereby are, granted an equitable lien in the amount of said judgment, on the property described herein and otherwise as "John Deere Model 3940, Forage Harvester," which lien is subordinate to the purchase money lien on said property in favor of the John Deere Company.

IT IS FURTHER ORDERED that the plaintiffs may have such costs as the prevailing parties in this proceeding as they prove within thirty days hereof.